## In re METROPOLITAN LIFE DERIVATIVE LITIGATION.

### Civil Action No. 93 Civ. 9035 (DC).

United States District Court,
S.D. New York.

July 16, 1996.

Law Office of Klari Neuwelt by Klari Neuwelt, New York City, for Plaintiff John F. Grubin.

Duker & Barrett, L.L.P. by William F. Duker, David A. Berger, New York City, Boies & McInnis by Mary Boies, Bedford, New York, for Plaintiff S. Lyle Roberts.

Miller Faucher Chertow Cafferty & Wexler by J. Dennis Faucher, Chicago, IL, Goodkind Labaton Rudoff & Sucharow by Linda P. Nussbaum, Christopher Lovell, P.C. by Christopher Lovell, P.C., New York City, for Plaintiffs Daniel L. Smith and Barbara L. Dannenberg.

Zwerling, Schachter, Zwerling & Koppell, LLP by Robert S. Schachter, New York City, for Plaintiff Veronica Donaldson.

Debevoise & Plimpton by John H. Hall, Gary W. Kubek, Steven S. Michaels, New York City, for Defendant Metropolitan Life Insurance Company.

Davis Polk & Wardwell by Henry L. King, William E. Wurtz, Joel M. Cohen, New York City, for Director Defendants.

## *OPINION*

CHIN, District Judge.

In this consolidated derivative litigation against defendants Metropolitan Life Insurance Company ("MetLife") and certain of its former and current officers, directors and employees, the parties seek approval of a proposed settlement and compromise. In addition, counsel for plaintiffs seek an award of $2.9 million in attorneys' fees and costs.

I find that the proposed settlement is fair, reasonable, and adequate. Hence, it is approved. The application for fees and costs, however, is granted in part and denied in part, for I find that the requested amount of $2.9 million is excessive.

Indeed, six lawsuits were filed when only one was necessary. The three later lawsuits introduced seven more law firms into the process when the interests of the MetLife policyholders were already being represented by four experienced sets of lawyers. The eleven law firms deployed 53 attorneys, an unwieldy and unnecessary number for this

Morris and Morris by Irving Morris, Karen L. Morris, Wilmington, Delaware, Lead Attorneys for Plaintiff Marie L. Sander.

Stull, Stull & Brody by Jules Brody, Timothy J. Dennin, P.C. by Timothy J. Dennin, New York City, for Plaintiff Marie L. Sander.

litigation. The complaint in the sixth lawsuit copied virtually word for word the complaint in the fifth lawsuit and even repeated a grammatical error in the first paragraph. The rates proposed for some of the 53 attorneys are excessive, the most egregious example being an attorney who seeks a rate of $550 per hour even though he has been practicing for only 15 years.

■ The concept of a "private attorney general" willing to take on injustices in our society is an important one. That concept, however, is abused when duplicative and superfluous litigation is brought for the sole purpose of generating legal fees. I will award fees and costs, but only to the extent of $1,971,886.93, as set forth below.

### STATEMENT OF THE CASE

#### A. Summary of the Facts [1]

MetLife is a New York mutual insurance company. It is the second largest life insurance company in the United States and sells life insurance and other insurance products through a national network of agents and offices. MetLife does not have shareholders, but, as a mutual insurance company, it is operated for the benefit of its members, i.e., its policyholders, of which there are apparently more than ten million nationwide.

In August 1993, state insurance regulators in Florida commenced an administrative investigation into allegations that MetLife agents were using deceptive and fraudulent sales practices. In October 1993, the press reported that MetLife was also being investigated for fraudulent sales practices by state insurance regulators in Pennsylvania. Eventually, at least 19 state regulatory bodies commenced investigations into MetLife's sales practices. These administrative proceedings culminated in an agreement by MetLife to pay a total of approximately $24 million in fines. In addition, MetLife offered full refunds to tens of thousands of policyholders who purchased whole life insurance policies. The Complaint alleges that these refunds were expected to cost MetLife some $76 million.

#### B. The Lawsuits

On November 22, 1993, Morris and Morris, lead counsel for plaintiff Marie L. Sander, wrote a letter to MetLife advising of her intent to sue, transmitting a draft derivative complaint, and requesting information as to the residency of two directors. The letter did not make a demand on MetLife to prosecute the claims. On December 21, 1993, in response to the letter, the Board of Directors of MetLife created a Special Review Committee (the "SRC") to investigate the allegations.

Although Sander was advised of the creation of the SRC, she filed suit in this Court on December 30, 1993, *Sander v. Athanassiades*, No. 93 Civ. 9035. The same day, a similar derivative suit was filed in the Supreme Court of the State of New York, New York County, *Grubin v. Athanassiades*, No. 93–134557. Eventually, four more lawsuits were filed asserting the same derivative claims: *Weiss v. Athanassiades*, No. 94 Civ. 0066, in this Court on January 5, 1994; *Roberts v. Metropolitan Life Insurance Company*, No. 94–103651, in state court on February 1, 1994; *Smith v. Kamen*, No. 94–108491, in state court on March 22, 1994; and *Donaldson v. Kamen*, No. 94–123047, in state court on August 10, 1994. The *Sander* and *Weiss* actions were consolidated on February 18, 1994. The Complaint was filed on April 1, 1994.[2]

The Complaint asserts two causes of action. Count I alleges that the Individual Defendants[3] breached their fiduciary duties

---

1. This summary is based on the facts alleged in the Second Verified Amended Policyholder Derivative Complaint (the "Complaint"), as clarified by the papers submitted in support of the proposed settlement and by counsel at the hearing on June 11, 1996.

2. The Complaint names only one plaintiff, Sander. References herein to "plaintiff" are to Sander and to "plaintiffs" are to all the named plaintiffs in all six cases.

3. "Individual Defendants" refers to all the individual defendants named in the Complaint, consisting of certain current and former directors, officers, and/or employees of MetLife. "Director Defendants" refers only to the sub-group of defendants who are current and former directors of MetLife.

to MetLife by failing to adequately oversee, supervise, and maintain control over MetLife's sales agents. Count II alleges that the Individual Defendants, based on the same alleged fiduciary breaches, must indemnify MetLife to the extent it is found liable for any of the Individual Defendants' failures to act in accordance with law.

After the filing of the Complaint, the parties commenced discovery. Some 17,000 pages of documents were produced by MetLife. On November 18, 1994, MetLife moved to dismiss the Complaint on two grounds. First, MetLife contended that plaintiff, as a policyholder of a New York mutual insurance company, did not have standing to bring a derivative action on MetLife's behalf. Second, MetLife contended that plaintiff was required, but had failed, to make a demand on MetLife's Board of Directors before bringing this action.

Before plaintiff could respond to the motion, and before any depositions were taken, settlement discussions were initiated. Upon request of the parties, plaintiff's time to respond to the motion was extended several times. A tentative settlement was reached in the interim.

### C. *The Proposed Settlement*

On March 22, 1996, after extensive negotiations, plaintiffs, MetLife, the Director Defendants, and the insurance carrier for MetLife's directors and officers entered into a stipulation (the "Stipulation") that set forth the proposed settlement of this action (the "Proposed Settlement"). Certain of the Individual Defendants who are not Director Defendants are not parties to the Stipulation, but the Stipulation nonetheless provides for the resolution of all claims against all the Individual Defendants.

The key features of the Proposed Settlement are as follows:

First, the insurance carrier for MetLife's directors and officers will pay $4 million to MetLife.

Second, MetLife will create and maintain for at least three years an independent Sales Practices Compliance Committee (the "SPCC") of its Board of Directors with duties and powers related to sales practices compliance. MetLife's Corporate Ethics and Compliance Department will be required to communicate directly with the SPCC on certain matters.

Third, MetLife will take sales practices compliance into account in making compensation and promotion decisions and in awarding prizes for group and individual performance.

Fourth, the instant consolidated case and the four state court lawsuits will be dismissed and the derivative claims of all the plaintiffs and MetLife policyholders (based on the events in question) will be released. The Proposed Settlement does not, however, release any individual claims that policyholders may have for direct injury. (*See* Tr. at 19–20).[4]

The Stipulation also acknowledges that MetLife took certain actions "[p]artly in response to" the litigation. For example, MetLife improved its ongoing compliance efforts, including its system of monitoring and overseeing customer and regulatory complaints. MetLife also reduced its compensation to all officers and certain other management personnel by $6.4 million for the year 1993 "in response to sales practices compliance issues raised in the Complaint and during the course of the Litigation." Following the commencement of this litigation, MetLife also appointed three new outside directors. The non-monetary terms of the Proposed Settlement as well as the steps taken "[p]artly in response to" the litigation are and were intended to prevent the type of sales practices that were criticized by the regulatory bodies and by many policyholders.

Finally, the Stipulation provides that plaintiffs would apply to this Court for reasonable attorneys' fees and costs, to cover all six lawsuits, in an amount not to exceed $2.9 million, to be paid by MetLife. In the Stipulation, MetLife and the Director Defendants agreed not to oppose the application as long as it did not request compensation in excess of that amount.

Notice of the Proposed Settlement was given by publication and a fairness hearing was scheduled for June 11, 1996.

---

4. References herein to "Tr." are to the transcript of the fairness hearing held on June 11, 1996.

## D. *The Objections*

Eleven responses to the Proposed Settlement were received.[5] One (Audrey and Edwin Weiss) was not an objection but was an unnecessary request to "opt out." (Tr. at 3–4). Six were objections that were withdrawn before the fairness hearing.[6] One policyholder (Dwight M. Schulz) objected to the Proposed Settlement because of concerns over his own policies; his objections were not to the terms of the Proposed Settlement. Another policyholder (Sylvia L. Corsini), who had purchased policies from MetLife in 1963 and approximately 1979–80, objected to the payment of attorneys' fees. Another policyholder (Stuart L. Posselt) objected to the payment of $2.9 million in attorneys' fees. Finally, another policyholder (Crosby P. Engel) opposed the Proposed Settlement because of a belief that it did not "punish[ ] the board members and employees responsible for the sales malfeasance and other misconduct and mismanagement."

## E. *The Requests for Attorneys' Fees and Costs*

Eleven sets of attorneys seek to be compensated for services rendered and costs incurred in connection with the consolidated federal case and four state court actions. The total "lodestar" amount is $2,263,211.25. It breaks down as follows:

| | Hours | Lodestar |
|---|---|---|
| Morris and Morris | 3,231.10 | $1,137,212.25 |
| Boies & McInnis | 674.20 | 219,026.00 |
| Cederberg, Shott & Smith, P.C. | 13.90 | 1,390.00 |
| Timothy J. Dennin, P.C. | 263.75 | 93,293.75 |
| Duker & Barrett, LLP | 977.85 | 244,477.50 |
| Goodkind Labaton Rudoff & Sucharow LLP | 237.30 | 69,821.50 |
| Lovell & Skirnick LLP | 43.25 | 18,381.25 |
| Miller Faucher Chertow Cafferty and Wexler | 234.20 | 73,926.50 |
| Law Office of Klari Neuwelt | 439.90 | 160,773.50 |
| Stull, Stull & Brody | 692.00 | 231,235.00 |
| Zwerling, Schachter, Zwerling & Koppell, LLP | 51.60 | 13,674.00 |
| Totals | 6,859.05 | $2,263,211.25 |

Plaintiffs also incurred costs totalling $145,251.25. The lodestar and costs together total $2,408,462.50. As plaintiffs are seeking an award of $2.9 million, they are requesting an enhancement of nearly half a million dollars.

## DISCUSSION

### A. *The Proposed Settlement*

#### 1. *Applicable Legal Standards*

 The standards to be applied in determining whether to approve the proposed settlement of a class action or derivative suit are well established. "The central question ... is whether the compromise is fair, reasonable and adequate." *Weinberger v. Kendrick,* 698 F.2d 61, 73 (2d Cir.1982), *cert. denied,* 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983). In making that inquiry, the Court must engage in a two-step process. First, it must consider "the substantive terms of the settlement" and compare them to " 'the likely rewards of litigation.' " *Id.* at 73 (*quoting Protective Comm. for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424–25, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968)); *accord Maywalt v. Parker & Parsley Petroleum Co.,* 67 F.3d 1072, 1079 (2d Cir.1995); *Malchman v. Davis,* 706 F.2d 426, 433 (2d Cir.1983). Second, the Court must examine "the negotiating process by which the settlement was reached" to ensure that the settlement is the result of arm's-length negotiations rather than collusion and that all interests have been effectively represented. *Weinberger,* 698 F.2d at 73–74.

 Public policy, of course, favors settlement. *Id.* at 73; *accord Williams v. First Nat'l Bank,* 216 U.S. 582, 595, 30 S.Ct. 441, 445, 54 L.Ed. 625 (1910) ("Compromises of disputed claims are favored by the courts.");

---

**5.** The eleven do not include an anonymous letter, which I have ignored. (Tr. at 2). Nor do they include a letter I received from a policyholder several weeks after the fairness hearing, which I have read but will not consider in deciding the issues before me.

**6.** These were: (1) Cular and Rinaldi, (2) Dornberger, (3) Higgins, (4) Urso, (5) Latta and Schneider, and (6) Holt and Holt. (*See* Tr. at 2–3).

*TBK Partners, Ltd. v. Western Union Corp.,* 675 F.2d 456, 461 (2d Cir.1982) (noting "the paramount policy of encouraging settlements"). Consequently, in determining whether a settlement is fair, reasonable, and adequate, the Court is not to substitute its judgment for that of the parties, nor is it to reopen and enter into negotiations with the parties, nor is it to turn consideration of the adequacy of the settlement "into a trial or a rehearsal of the trial." *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 462 (2d Cir. 1974) ("*Grinnell I*"); *Steinberg v. Carey,* 470 F.Supp. 471, 474 (S.D.N.Y.1979); *Lewis v. Newman,* 59 F.R.D. 525, 527–28 (S.D.N.Y. 1973). Rather,

> the Court's responsibility is to reach 'an intelligent and objective opinion of the probabilities of ultimate success should the claims be litigated' and to 'form an educated estimate of the complexity, expense and likely duration of such litigation . . . and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise.'

*Lewis,* 59 F.R.D. at 527–28 (*quoting Protective Comm. for Independent Stockholders,* 390 U.S. at 424, 88 S.Ct. at 1163).

### 2. *Application to this Case*

■ Applying these principles, I am satisfied that the Proposed Settlement is fair, reasonable, and adequate. In reaching this conclusion, I have considered the following factors: (a) the benefits achieved by the Proposed Settlement; (b) the likelihood of success if the case were to be litigated; (c) the potential recovery; (d) the likely duration and cost of continued litigation; (e) the quality of the negotiating process and the views of counsel; and (f) the objections. *See Grinnell I,* 495 F.2d at 463; *Saylor v. Bastedo,* 100 F.R.D. 44, 49 (S.D.N.Y.1983).

### a) *Benefits Achieved*

The benefits achieved by the Proposed Settlement, if it is approved, would be substantial. MetLife will receive a payment of $4 million. MetLife also saved some $6.4 million as the 1993 compensation to its officers and certain other managers was reduced by that amount, in part as a result of plaintiffs' efforts in this litigation. The proposed creation of the SPCC would be a significant structural change in MetLife's management.[7] Likewise, the other improvements in MetLife's sales compliance practices, some already adopted, will surely help prevent recurrence of the sales practices that led to the regulatory actions and ultimately this lawsuit.

### b) *Likelihood of Success*

If plaintiffs were to litigate this case on the merits, they would face several significant hurdles. MetLife's pending motion to dismiss the Complaint raises two potentially dispositive defenses: lack of standing and failure to make a demand on the board of directors. In addition, of course, if the merits are reached, defendants will vigorously deny any liability.

Defendants' standing argument has great appeal. Although the right of shareholders to bring derivative actions on behalf of corporations is established by Section 626 of the Business Corporation Law (the "BCL"), Section 108(d) of the Insurance Law provides that, with one exception inapplicable here, Article 6 of the BCL (and hence Section 626) is inapplicable to a New York mutual insurer. *See* N.Y.Bus.Corp.Law § 626 (McKinney 1986); N.Y.Ins.Law § 108(d) (McKinney 1985).[8] Moreover, the parties have not cited any case decided after Section 108(d) was adopted in 1964 upholding (or rejecting) the right of a policyholder to maintain a derivative action on behalf of a New York mutual

---

**7.** Karen L. Morris, Esq., of Morris and Morris, Lead Counsel for plaintiff Sander, represented to the Court that neither she nor her father, who has been litigating derivative cases for 40 years, has ever previously succeeded in "negotiating a structural change of this type." (Tr. at 13–14). Likewise, counsel for MetLife represented that the creation of the SPCC was not "window dressing," but that it will be "a committee with a serious charter." (*Id.* at 18).

**8.** In contrast, Section 108(a) of the Insurance Law calls for the application generally of the Business Corporation Law to New York insurance companies.

insurer.[9] In addition, the fact that the relationship between a mutual insurer and a policyholder "is not of a fiduciary nature" but is instead that of a debtor and creditor, *see Fidelity & Cas. Co. v. Metropolitan Life Ins. Co.*, 42 Misc.2d 616, 248 N.Y.S.2d 559, 565 (S.Ct.N.Y.Co.1963), supports the proposition that a policyholder does not have the ownership interest usually required to support a derivative action.

Even assuming plaintiffs have standing to bring a derivative action, they did not make a demand on MetLife's Board, as required by Fed.R.Civ.P. 23.1 and Section 626 of the BCL. While the Complaint does allege "demand futility," clearly there exists a substantial risk that plaintiffs would not prevail in this respect. Indeed, MetLife promptly formed the SRC after receiving Sander's letter and draft complaint and commenced an investigation into her charges. Although Sander was advised of the formation of the SRC, she nonetheless commenced litigation without making a demand.

Finally, even if the merits were to be reached, victory would be far from certain. In addition to the usual risks and uncertainties attendant to a jury trial, plaintiffs would also have to overcome the provision in MetLife's charter, included pursuant to Section 402(b) of the BCL, that allows monetary recovery against directors only in limited circumstances, such as improper personal financial gain, bad faith, or intentional misconduct. Plaintiffs also would have to persuade a jury to accept the proposition that the 23 Individual Defendants breached their duties to MetLife in the face of evidence that senior management and the Board investigated the allegations of improper sales practices and took significant remedial measures.

#### c) *Potential Rewards*

Even assuming that plaintiffs were to prevail if they were to litigate this case, it is unclear what they would recover. In terms of non-monetary relief, I doubt that they would do substantially better than what has already been achieved, in view of the structural and other changes in management and sales compliance practices that have been agreed to or that have already been implemented. The potential monetary relief, however, is more difficult to evaluate.

Although $24 million in fines were paid and some $76 million in refunds are expected, the potential damages in this case undoubtedly would not reach $100 million. The refunds probably would not be recoverable as damages and the recoverability of the amount of the fine as damages would be "debatable, at best." (Tr. at 5). The damages that plaintiff would seek to prove at trial would probably be more in the nature of loss of good will and loss of future sales, damages that are usually difficult to prove. (Tr. at 5–6). Causation would also be difficult to prove. Although a complete victory on liability and damages would probably result in a recovery substantially in excess of the $4 million being paid by the insurance carrier, the possibility of a complete victory is remote. *See In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 142 F.R.D. 588, 595 (S.D.N.Y.1992) ("In the real world, . . . the path to a large damage award is strewn with hazards.").

#### d) *The Duration and Cost of Continued Litigation*

Continued litigation of this case would put a strain on all the parties. This consolidated federal case is already substantially more than two years old. Four state court cases are also pending. If these cases must be litigated, several more years of litigation would be required. MetLife's motion to dismiss is still pending; plaintiff has yet to respond. Although documents have been produced, no depositions have been taken yet. With 23 Individual Defendants and managers, sales representatives and policyholders from all over the country as potential deponents, the deposition phase of the case

---

**9.** Plaintiffs have cited two pre-Section 108(d) cases, *Young v. Equitable Life Assurance Soc.*, 49 Misc. 347, 99 N.Y.S. 446, *aff'd*, 112 App.Div. 760, 98 N.Y.S. 1052 (3d Dep't 1906); *Garfield v. Equitable Life Assurance Soc.*, 7 Misc.2d 283, 164 N.Y.S.2d 819 (S.Ct.N.Y.Co.1956), as well as one post-Section 108(d) decision, which dismissed a policyholder's derivative suit on different grounds without addressing the issue of standing. *Stoner v. Walsh*, 772 F.Supp. 790 (S.D.N.Y. 1991).

would be extremely expensive and time-consuming. The factual issues are complex and the documents, including the files from at least 19 state regulatory proceedings, are voluminous. In view of the effort and expense that would be required to take this case to and through trial, settlement would undoubtedly be in the best interest of all the parties and the policyholders.

### e) *The Negotiating Process*

The Proposed Settlement is the result of extensive arm's-length negotiations among counsel for plaintiffs, MetLife, and the Director Defendants. Counsel for all parties are experienced in litigating derivative suits and class actions, and the interests of the policyholders were well represented. Counsel have thoroughly investigated and evaluated plaintiffs' claims. Accordingly, their recommendation for approval of the Proposed Settlement is entitled to "considerable weight." *Fielding v. Allen,* 99 F.Supp. 137, 144 (S.D.N.Y.1951).

### f) *The Objections*

The notice of the Proposed Settlement, which I find was adequate,[10] resulted in only eleven responses, of which six were withdrawn and one was an unnecessary request to "opt-out." Three asserted personal grievances and/or opposition to the request for attorneys' fees. The final objection expresses the view that the Proposed Settlement does not "punish[ ]" the "responsible" individuals. None of the objections, however, provides a basis for rejecting the Proposed Settlement.

Accordingly, the Proposed Settlement is approved.

### B. *The Requests for Attorneys' Fees and Costs*

### 1. *Applicable Legal Standards*

■ Plaintiffs' counsel's application for fees and costs is based on the equitable fund. doctrine, which allows "an attorney whose actions have conferred a benefit upon a given group or class of litigants [to] file a claim for reasonable compensation for his efforts." *City of Detroit v. Grinnell Corp.,* 560 F.2d 1093, 1098 (2d Cir.1977) ("*Grinnell II*"). The Court's primary concern, in reviewing such a fee application, "is whether the work performed resulted in a benefit to the class." *In re Agent Orange Prod. Liab. Litig.,* 818 F.2d 226, 237 (2d Cir.1987) (*citing Grinnell II,* 560 F.2d at 1099). These concepts are also applicable to derivative cases. *Christensen v. Kiewit–Murdock Inv. Corp.,* 815 F.2d 206, 211 (2d Cir.), *cert. denied,* 484 U.S. 908, 108 S.Ct. 250, 98 L.Ed.2d 209 (1987).

Courts have used two methods to calculate the fees to be awarded in common fund cases: the "percentage of fund" approach and the "lodestar" method. *See, e.g., In re First Investors Sec. Litig.,* No. 90 Civ. 7225, 1995 WL 765569, at *3 (S.D.N.Y. Dec. 28, 1995) (applying percentage of fund approach in derivative class action); *In re Ivan F. Boesky Sec. Litig.,* 888 F.Supp. 551, 560–61 (S.D.N.Y.1995) (applying lodestar method); *Chatelain v. Prudential–Bache Sec., Inc.,* 805 F.Supp. 209, 215 (S.D.N.Y.1992) (noting courts' emerging preference for percentage approach). Some district judges have expressed the view that they lack the authority to reject outright the lodestar approach adopted by the Second Circuit in *Grinnell I,* 495 F.2d at 470–71; *see, e.g., In re Boesky Sec. Litig.,* 888 F.Supp. at 560 (holding that *Grinnell I* requires use of lodestar method in common fund cases); *Cosgrove v. Sullivan,* 759 F.Supp. 166, 168 (S.D.N.Y.1991) (same). Other judges have elected to consider both methods in determining whether a fee request is reasonable. *See, e.g., Breiterman v. Roper Corp.,* No. 88 Civ. 2138, 1990 WL 15535, at *3–4 (S.D.N.Y. Jan. 12, 1990) (applying percentage method but noting that fee awarded was proper under lodestar analysis); *In re Ames Dep't Stores, Inc. Debenture Litig.,* 835 F.Supp. 147, 149–50 (S.D.N.Y. 1993) (using lodestar to test propriety of award based on percentage recovery).

Under the lodestar method, the "lodestar" is calculated by multiplying the number of

---

**10.** Because MetLife has millions of policyholders, individual notice was not practicable. Notice was published twice in one national newspaper and four major regional newspapers, once on April 11, 1996 and again on April 18, 1996, more than 50 days before the hearing.

hours reasonably expended by the prevailing rates for the services provided. *See In re Boesky Sec. Litig.*, 888 F.Supp. at 560; *Grinnell I*, 495 F.2d at 470–71. The prevailing rate is the "rate normally charged for similar work by attorneys of like skill in the area," taking into account factors such as the experience of the attorney performing the work and the type of work performed. *Grinnell II*, 560 F.2d at 1098; *see Grinnell I*, 495 F.2d at 471.

■ Once the lodestar is calculated, the court considers whether an enhancement or decrease is warranted. *See Grinnell I*, 495 F.2d at 471; *Breiterman*, 1990 WL 15535, at *3. A multiplier may be applied to the lodestar to account for factors such as contingent risk, quality of representation, and results achieved. *See, e.g., In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 226, 234–35 (2d Cir.1987). The Second Circuit has endorsed the idea that a multiplier, while permissible, is not necessary if "an attorney will receive an otherwise reasonable compensation for his time from the lodestar figure alone." *Grinnell II*, 560 F.2d at 1099; *see In re Boesky Sec. Litig.*, 888 F.Supp. at 561. In recent years, the propriety of enhancements of lodestars has been questioned, *Boesky*, 888 F.Supp. at 564 n. 6 (referring to *In re Bolar Pharmaceutical Co., Inc. Sec. Litig.*, 800 F.Supp. 1091, 1096 n. 7 (E.D.N.Y.1992)), and some courts have declined to award multipliers. *See, e.g., Maywalt v. Parker & Parsley Petroleum Co.*, 864 F.Supp. 1422, 1437 (S.D.N.Y.1994), *aff'd*, 67 F.3d 1072 (2d Cir. 1995).

### 2. *The Instant Application*

■ The present litigation certainly has benefitted the policyholders of MetLife. A common fund of $4 million has been generated. Plaintiffs' counsel also deserve credit for at least some of the substantial non-monetary benefits as well. Hence, a fee award is appropriate.

■ Plaintiffs' counsel contends that the Proposed Settlement would achieve monetary benefits of $10.4 million, consisting of the $4 million insurance proceeds payment and the $6.4 million reduction in management compensation for 1993. If this proposition were to be accepted, the requested fees of $2,754,748.75 (which is the amount remaining after deducting costs from the total request of $2.9 million) would represent 26.5% of the monetary value of the Proposed Settlement. Under the "lodestar" approach, an award of $2,754,748.75 in fees would represent an application of a multiplier of approximately 1.22 to the lodestar of $2,263,211.25.

While I believe that the percentage approach makes sense in these types of cases as a general matter,[11] I will apply the lodestar method in this case because of the difficulty of setting the value of the common fund or benefit generated by this litigation. I am not persuaded that the $6.4 million reduction in 1993 compensation should be included. Assuming the management personnel in question caused MetLife to incur $24 million in fines and to repay $76 million in refunds, the fact that they received $6.4 million less in compensation for 1993 is hardly a compelling basis for awarding attorneys' fees. Moreover, even assuming the reduction in compensation is an appropriate basis for awarding fees, I do not believe plaintiffs can claim credit for the entire $6.4 million reduction. Although the issue of a reduction in compensation was raised by plaintiffs' counsel early in the settlement negotiations, common sense suggests that the compensation would have been reduced substantially in any event. Indeed, as MetLife's counsel put it, a reduction in compensation was "a good idea" with "many parents." (Tr. at 9; *see also id.* at 6–8). Because it is impossible for me to determine whether the common fund generated by this litigation was $4 million or $10.4 million

---

**11.** Critics of the lodestar method note that it promotes inefficiency, imposes unnecessary burdens upon the court, and encourages unjustified work by attorneys. *See In re Boesky Sec. Litig.*, 888 F.Supp. at 561; *Breiterman*, 1990 WL 15535, at *3. For its part, the Supreme Court has never expressly adopted the lodestar method for calculating fees in common fund cases; in fact, in dicta, the Court suggested that it continues to support the percentage of fund approach. *See Breiterman*, 1990 WL 15535, at *3 (discussing *Blum v. Stenson*, 465 U.S. 886, 900 n. 16, 104 S.Ct. 1541, 1550 n. 16, 79 L.Ed.2d 891 (1984)).

or somewhere in between, I will apply the lodestar method.

The total lodestar, for all eleven law firms, is $2,263,211.25, based on 6,859.05 hours multiplied by rates ranging from $65 per hour (for certain paralegals) to $550 per hour (for two Duker & Barrett partners). Certain aspects of the fee application, however, are most troubling. Consequently, substantial reductions are warranted.

First, there was no reason for six lawsuits. The first two lawsuits were filed the same day, December 30, 1993. The *Weiss* case followed just a few days later, January 5, 1994. . At that point, the interests of the policyholders were already well represented by four sets of practitioners with extensive experience in this area of the law: Morris and Morris (*Sander*), Klari Neuwelt, Esq. (*Grubin*), and Stull, Stull & Brody and Timothy J. Dennin, Esq. (*Weiss*). Yet, three more essentially identical lawsuits were filed that added nothing to the mix other than more lawyers. The last of the six lawsuits, *Donaldson,* was filed by Zwerling, Schachter, Zwerling & Koppell, LLP almost eight months after the first two cases were filed. The·*Donaldson* complaint was copied virtually word for word from the complaint filed in the fifth lawsuit (*Smith*) almost four months earlier.[12] In fact, paragraph 1 of the *Donaldson* complaint even repeats a grammatical error that appears in paragraph 1 of the *Smith* complaint, and it adds a new typographical error in the process. Although the Zwerling, Schachter firm copied the *Smith* complaint and no motions were filed in *Donaldson,* the firm nonetheless claims 23.4 hours for "Pleadings and Motions."[13] As Judge Weinstein observed in the context of class actions,

Attorneys who file individual suits on the same claims involved in the class action do not substantially aid the prosecution of the class action.... An award of fees for such 'me too' litigation would encourage fruitless and unnecessary work.

*In re Agent Orange Prod. Liab. Litig.,* 611 F.Supp. 1296, 1307 (E.D.N.Y.1985), *aff'd in part, rev'd in part,* 818 F.2d 226 (2d Cir. 1987). Likewise, the Second Circuit has held:

[A] duplicative action which contributes virtually nothing to the ultimate result cannot justify an award of counsel fees.... [A]n award of compensation to latecomers who add nothing of value would encourage the bringing of superfluous litigation solely for an award of fees.

*Gerena–Valentin v. Koch,* 739 F.2d 755, 759 (2d Cir.1984).

Second, the eleven law firms deployed 53 lawyers and 30 paralegals, law clerks, and summer associates on these cases. Eleven law firms, 53 attorneys, and 30 paralegals, clerks, and summer associates were not needed to perform the work to date. Indeed, depositions have yet to be conducted. Moreover, 38 of the 53 lawyers are partners (or bill at partner rates).[14] The duplication of effort must have been rampant, and the representation of the policyholders could not have been efficient. *See Seigal v. Merrick,* 619 F.2d 160, 164 n. 9 (2d Cir.1980) (lodestar may be reduced for "overstaffing" as well as "other forms of duplicative or inefficient work"); *In re Agent Orange,* 611 F.Supp. at 1306. In contrast, defendants were represented by only two, albeit large, law firms.

Third, the rates requested, in some instances, are unreasonably high. The rates range from a low (for attorneys) of $100 per

---

12. Indeed, the only differences in the page-long introductory paragraphs in both complaints describing the Nature of the Action are the following: (1) the changes resulting from the difference in the number of plaintiffs (only one in *Donaldson* but two in *Smith* ); (2) an increase from the "$96 million" referred to in *Smith* to "$100 million" in *Donaldson;* and (3) the addition of a few words in paragraph 1 of the *Donaldson* complaint defining the term "Board." Both paragraphs are set forth in full in the Appendix that appears at the end of this Opinion.

13. Conceivably, a portion of the 23.4 hours was spent reviewing MetLife's motion papers in the instant case. There was no need for Zwerling, Schachter to do so, however, as ten other law firms were already involved. Moreover, the firm's conclusory descriptions of work performed make no mention of any such work. (*See* Schachter Aff., ¶¶ 3, 4 & Exh. A).

14. Some of the firms do not identify whether an individual for whom compensation is sought is a partner or an associate or, for that matter, an attorney at all. (*See, e.g.,* Duker Aff., Exh. A).

hour for a partner of Cederberg, Shott & Smith, P.C., a law firm located in Missoula, Montana, to a high of $550 per hour for two Duker & Barrett partners.

Duker & Barrett warrants special mention. It represents that fifteen of its attorneys worked on these cases. Six of the fifteen are purportedly billed at rates of $400 per hour or more, including two who have been practicing since only 1985. The average billing rate for the six is $455. The rates of $550 per hour are submitted for David A. Barrett, Esq. and William F. Duker, Esq. According to the firm resume that Duker & Barrett submitted to the Court in support of the fee application, Mr. Barrett has been practicing since 1974. The resume does not, however, reveal when Mr. Duker started practicing law, and I can understand why: Martindale–Hubbell shows that he did not graduate from law school until 1981. Hence, he has been in practice for only 15 years; yet, he requests a rate of $550 per hour. In contrast, Irving Morris, Esq., Jules Brody, Esq., and Edward Labaton, Esq., three of the leading members of the plaintiffs' securities bar who have been practicing law for many years, requested rates of $465, $495, and $460 per hour, respectively.[15] In the real world, I cannot imagine any client tolerating the assignment of six partners at an average rate of $455 per hour to one matter, where the client's interests were already being represented by five other competent law firms.

With these concerns in mind, I review each firm's request for fees. I will proceed through the six cases in the order in which they were filed. By proceeding in this manner, I do not suggest that each firm's work was limited to the case that it filed; I understand that counsel in the state cases contributed in varying degrees to the efforts in the

instant consolidated federal case. In addition, I will not apply an upward multiplier. The fees that I award below already consume almost half of the $4 million fund that has been generated. Under these circumstances, application of an upward multiplier would not be fair to the policyholders.

### a) *Sander*

Morris and Morris, lead counsel for plaintiff *Sander*, reports a lodestar amount of $1,137,212.25, based on 3,231.10 hours at hourly rates ranging from $100 for a paralegal to $465 for Mr. Morris. The firm also requests reimbursement of $106,863.22 in expenses (including $10,220.28 in "Research" costs, which presumably were computer research costs). The work of Morris and Morris has been impressive. Some of the rates applied, however, are high. I have thus made some modest adjustments. The number of hours and the amount of costs are reasonable. Morris and Morris is awarded fees of $1,116,000.00 and costs of $106,863.22.

### b) *Grubin*

Klari Neuwelt, Esq., who filed *Grubin* the same day that *Sander* was filed, submits a lodestar of $160,773.50 based on 439.90 hours at hourly rates of $395 for her and $125 for a summer associate. She also submits costs of $1,287.03. I find that the number of hours, proposed rates, and costs incurred are reasonable. Hence, Ms. Neuwelt is awarded fees of $160,773.50 and costs of $1,287.03.

### c) *Weiss*

Stull, Stull & Brody reports a lodestar of $231,235.00 based on 692 hours at hourly rates ranging from $140 (for paralegals) to $495 for Mr. Brody. The firm submits costs of $3,168.45. The firm of Timothy J. Dennin, P.C. reports a lodestar of $93,293.75 based on

---

**15.** At the fairness hearing, after I observed that Irving Morris, Esq. submitted an hourly rate of $465, the following exchange occurred with a representative of Duker & Barrett:

THE COURT: In view of that, how is it that Mr. Duker and Mr. Barrett can put in for rates of $550 an hour?

MR. BERGER: Your Honor, I can't speak to exactly setting the rate. I don't have personal responsibility for that.

I can say that I think they are experienced—

THE COURT: Does Duker & Barrett charge its clients $550 an hour for their time?

MR. BERGER: It is my understanding, your Honor, on both contingent and noncontingent matters those are the rates that we charge. It may be a sad commentary for the legal profession, but I believe that is—everything I know from the firm, that is correct.

(Tr. at 30–31).

263.75 hours at hourly rates of $385 for Mr. Dennin and $85 for a law clerk. The Dennin firm also seeks costs of $396.

The *Weiss* case was filed in this Court just a few days after *Sander* and *Grubin* were filed. Moreover, *Weiss* was consolidated with *Sander* and counsel in *Weiss* worked closely with lead counsel for *Sander* once the two cases were consolidated. Some of the rates applied by Stull, Stull & Brody are high, however, particularly the paralegal rate. Likewise, I find the rate of $385 per hour for Mr. Dennin is high. Consequently, I will make some modest reductions. The number of hours and the amount of costs are reasonable.

Accordingly, Stull, Stull & Brody is awarded fees of $211,235.00 and costs of $3,168.45. Timothy J. Dennin, P.C. is awarded fees of $73,000.00 and costs of $396.00.

### d) *Roberts*

The *Roberts* case was filed by Duker & Barrett and Boies & McInnis. Duker & Barrett submits a lodestar of $244,477.50 based on 977.85 hours at rates ranging from $80 to $550 per hour. It requests costs of $16,012.91 (including $11,939.00 for "Computer Research"). Boies & McInnis submits a lodestar of $219,026 based on 674.2 hours at rates ranging from $70 to $450 an hour. It requests costs of $2,208. In total, these amounts exceed $481,000.

While I accept counsel's representations that this time was expended and these costs incurred, I find that the policyholders did not receive $481,000 in value. When the *Roberts* case was filed on February 1, 1994, three other identical lawsuits had already been filed. The policyholders were already represented by four sets of experienced lawyers. While the affidavits show that Duker & Barrett and Boies & McInnis participated in the prosecution of the consolidated case, the pro-

cess could not have been efficient and the duplication of effort must have been considerable. Moreover, as noted above, the rates are excessive (particularly for Duker & Barrett).

Accordingly, Duker & Barrett is awarded fees of $110,000.00 and costs of $10,043.41 (I have cut the computer costs in half). Boies & McInnis is awarded fees of $112,000.00 and costs of $2,208.00.[16]

### e) *Smith*

Cederberg, Shott & Smith, PC, a Montana law firm, reports a lodestar of $1,390.00 based on 13.90 hours at $100 per hour and costs incurred of $76.26. The firm's affidavit explains that the firm is counsel for Daniel L. Smith, the plaintiff in the *Smith* action. I cannot tell from the materials submitted, however, what role the Cederberg, Shott firm played, as the *Smith* complaint shows that it was filed by three other law firms: two New York law firms and a Chicago firm. Under these circumstances, while the amounts requested are modest, Cederberg, Shott's request is disallowed in its entirety.

■ The two New York firms are Goodkind Labaton Rudoff & Sucharow and Christopher Lovell, P.C. (now Lovell & Skirnick LLP) and the Chicago firm is Miller Faucher Chertow Cafferty and Wexler. Their lodestars and costs are as follows: Goodkind Labaton: $69,821.50 in fees (237.3 hours at rates ranging from $110 to $450 per hour) and $9,918.96 in costs (including $6,797.39 in computer research costs); Lovell & Skirnick: $18,381.25 in fees (43.25 hours at $425 per hour) and $1,338.70 in costs (including a payment of $1,250 to another law firm); and Miller Faucher: $73,926.50 in fees (234.2 hours at rates of $65 to $425 per hour) and costs of $3,053.39. The amounts for all three firms total some $176,000.

---

**16.** I have reduced the lodestars for Duker & Barrett by 25% and for Boies & McInnis by 15% to account for what I believe are high rates. I have then reduced the resulting revised lodestars by 40% to account for the inefficiencies and duplication that resulted from the involvement of two more law firms, when the policyholders were already being represented by four sets of experienced lawyers. *See In re Agent Orange,*

818 F.2d at 237 (where fee applications are voluminous and substantial in number, "the district court has the authority to make across-the-board percentage cuts in hours 'as a practical means of trimming fat from a fee application'") (*quoting New York Ass'n for Retarded Children, Inc. v. Carey,* 711 F.2d 1136, 1146 (2d Cir.1983)). I then rounded off.

While I accept counsel's representation that they expended the hours and incurred the expenses reported, I cannot accept the proposition that the policyholders received $176,000 in value. Four other lawsuits had already been filed. The policyholders were already represented by six sets of lawyers. Again, while the *Smith* lawyers may have participated in the prosecution of the consolidated federal case, the inefficiencies and duplication must have been substantial. I have difficulty understanding, for example, the need for a Chicago law firm to conduct legal research on derivative claims involving New York mutual insurance companies when several other law firms had already done so. In addition, I find that the rates are high.

Accordingly, Goodkind, Labaton is awarded fees of $24,000.00 and costs of $6,520.23 (I have cut the computer costs in half). Lovell & Skirnick is awarded fees of $6,250.00 and costs of $88.70 (I have eliminated the $1,250 payment to the other law firm). Miller, Faucher is awarded fees of $25,000.00 and costs of $3,053.39.[17]

#### f) *Donaldson*

 Zwerling, Schachter, Zwerling & Koppell, LLP reports a lodestar of $13,674.00 based on 51.6 hours at rates ranging from $90 to $415 an hour. The firm also submits expenses of $928.50. As noted, the *Donaldson* case was filed some eight months after *Sander* and *Grubin* were filed, using a complaint that was essentially a verbatim copy of the *Smith* complaint. The firm's affidavit submitted in support of a fee award offers no explanation of why a sixth lawsuit was necessary and no one from the firm appeared at the fairness hearing to answer the Court's questions. I find that the firm provided no benefit to the policyholders. Accordingly, Zwerling, Schachter's request for $13,674.00 in fees and $928.50 in costs is disallowed in its entirety.

#### 3. *Summary of Fees and Costs Awarded*

To summarize, fees and costs are awarded as follows:

| | Fees | Costs |
|---|---|---|
| Morris and Morris | $1,116,000.00 | $106,863.22 |
| Boies & McInnis | 112,000.00 | 2,208.00 |
| Cederberg, Shott & Smith, P.C. | 0 | 0 |
| Timothy J. Dennin, P.C. | 73,000.00 | 396.00 |
| Duker & Barrett, LLP | 110,000.00 | 10,043.41 |
| Goodkind Labaton Rudoff & Sucharow LLP | 24,000.00 | 6,520.23 |
| Lovell & Skirnick LLP | 6,250.00 | 88.70 |
| Miller Faucher Chertow Cafferty and Wexler | 25,000.00 | 3,053.39 |
| Law Office of Klari Neuwelt | 160,773.50 | 1,287.03 |
| Stull, Stull & Brody | 211,235.00 | 3,168.45 |
| Zwerling, Schachter, Zwerling & Koppell, LLP | 0 | 0 |
| Totals | $1,838,258.50 | $133,628.43 |

The fees and costs together total $1,971,886.93. I find that this amount, distributed as set forth above, will fairly and reasonably compensate plaintiffs' counsel, taking into account the time and labor expended, the complexity of the issues, the risks of litigation, the quality of representation, the benefits to the policyholders achieved, the duplication and inefficiencies discussed above, and public policy considerations.

### CONCLUSION

The Proposed Settlement is hereby approved. The application for fees and costs is granted in part and denied in part. Fees and costs of $1,971,886.93 are awarded, as set forth above. Judgment will be entered accordingly.

SO ORDERED.

### APPENDIX

Paragraph 1 of the *Smith* complaint reads as follows:

Plaintiffs bring this action as a derivative action on behalf and for the benefit of Metropolitan Life Insurance Company ("Met" or the "Company"). Plaintiffs assert that Met's directors and management breached their fiduciary obligations to Met by actively promoting and/or approving conduct in violation of applicable laws and regulations in connection with the marketing and sale of life insurance policies. As a result, Met has incurred fines, penalties

---

**17.** I reduced the lodestars for all three firms by 15% to account for what I find to be excessive rates. I then reduced each revised lodestar by an additional 60% to reflect the inefficiencies and duplication of effort that I find resulted from the involvement of three more law firms when six sets of experienced lawyers were already representing the interests of the policyholders. I then rounded off.

and restitution payments in excess of $96 million, and faces unknown amounts in future fines. Not only was Met's most senior management aware of the Company's activities, but over the lengthy period encompassing these activities, investigations by state agencies were commenced concerning these activities which, together with attendant publicity, put Met's directors on notice, or but for their recklessness, should have put them on notice of senior management's conduct which could have been (and was) significantly harmful to Met and its shareholders. As a result, this complaint charges the entire board of Met with failure to fulfill their *[sic]* fundamental fiduciary obligation to protect Met from such harm by (i) designing and monitoring adequate controls to ensure compliance with applicable law and regulations; and (ii) failing to take steps after actual or constructive notice of such wrongful acts to correct and/or terminate these wrongful practices. Further, the entire Board has breached its fiduciary duty by failing to adequately supervise and monitor the conduct of Met's most senior executives.

Paragraph 1 of the *Donaldson* complaint reads as follows, with the boldfaced type showing the differences from paragraph 1 of the *Smith* complaint:

Plaintiff[ ] bring[s] this action as a derivative action on behalf and for the benefit of Metropolitan Life Insurance Company ("Met" or the "Company"). Plaintiff[ ] assert[s] that Met's directors and management breached their fiduciary obligations to Met by actively promoting and/or approving conduct in violation of applicable laws and regulations in connection with the marketing and sale of life insurance policies. As a result, Met has incurred fines, penalties and restitution payments in excess of [$100] million, and face[ ] *[sic]* unknown amounts in future fines. Not only was Met's most senior management aware of the Company's activities, but over the lengthy period encompassing these activities, investigations by state agencies were commenced concerning these activities which, together with attendant publicity, put Met's directors on notice, or but for their recklessness, should have put them

on notice of senior management's conduct which could have been (and was) significantly harmful to Met and its shareholders. As a result, this complaint charges the entire board of Met with failure to fulfill their *[sic]* fundamental fiduciary obligation to protect Met from such harm by (i) designing and monitoring adequate controls to ensure compliance with applicable law and regulations; and (ii) failing to take steps after actual or constructive notice of such wrongful acts to correct and/or terminate these wrongful practices. Further, the entire Board **[of Directors of Met (the "Board")** ] has breached its fiduciary duty by failing to adequately supervise and monitor the conduct of Met's most senior executives.