Gila FEINBERG, on behalf of herself
and all others similarly situated,
Plaintiffs,

v.

HIBERNIA CORPORATION and
Martin C. Miler, Defendants.

Civil Action No. 90–4245.

United States District Court,
E.D. Louisiana.

May 14, 1997.

## ORDER AND REASONS

BERRIGAN, District Judge.

This matter is before the court for determination of whether the proposed settlement between the parties should be approved and, if so, what the appropriate allocations for attorneys' fees and various expenses are.

The proposed settlement provides that the defendants will pay up to $20 million in cash

and interest from March 24, 1995, to be used for settlement payments, attorneys' fees and out-of-pocket expenses. The defendants commit to an additional $200,000 for class notification costs and costs of administering the settlement, with any excess costs to be paid out of the settlement fund.

Plaintiffs' counsel seek $7 million or 35% of the settlement amount in fees, in addition to their costs and expenses. The accounting firm of David Berdon & Company seeks compensation in addition to the $200,000 allocated for their services as Claims Administrator. Counsel for objectors seek attorneys' fees and costs for his role in contesting the proposed attorney fee and expense allocation to plaintiffs' counsel.

## I. THE LITIGATION

In 1990, and by amended complaint in 1992, the plaintiff, Gila Feinberg, filed a class action on behalf of persons and entities who purchased common stock of the Hibernia Corporation ("Hibernia") between March 19, 1990 and July 30, 1991. The complaint alleged that Hibernia, its board of directors and its president and chief executive officer, Martin C. Miler, disseminated false and misleading statements regarding Hibernia's financial condition to the detriment of the investing public. The statutory authorities for the complaint were Sections 10(b) and 20(a) of the Securities Exchange Act; the Louisiana Blue Sky Law; Louisiana Civil Code article 2315 and Louisiana Revised Statute § 22:655.

After class certification and the denial of a motion to dismiss, the parties engaged in extensive and frequently contested discovery matters over a period of several years. Serious settlement negotiations then followed and a month before the scheduled trial date of March 13, 1995, and with the able and determined assistance of Magistrate Judge Lance Africk, the parties did in fact reach agreement. The settlement was preliminarily approved by U.S. District Judge Frederick J.R. Heebe in August, 1995.

A Fairness Hearing was held on February 1, 1996, to accept evidence and argument as to whether final approval of the settlement should be granted and for a determination of fees and expenses. Subsequent to the hearing, the court learned that some potential claimants did not receive timely notice of the hearing. As a result, a new Fairness Hearing was scheduled and the claimants re-noticed. The second Fairness Hearing was held on April 1, 1997. Objections were lodged to the proposed attorney fee and expense allocation to plaintiffs' counsel but no objection was lodged to the settlement itself.

## II. THE SETTLEMENT

■ A class action cannot be settled without the approval of the court. Fed.R.Civ. P.23(e). In deciding whether to approve a proposed settlement, the Fifth Circuit has set forth six key factors:

(1) whether the settlement was the product of fraud or collusion;

(2) the complexity, expense and likely duration of the litigation;

(3) the stage of the proceedings and the amount of discovery completed;

(4) the factual and legal obstacles to prevailing on the merits;

(5) the possible range of recovery and the certainty of damages; and

(6) the respective opinions of the participants, including class counsel, class representatives, and absent class members.

*Reed v. General Motors Corp.,* 703 F.2d 170, 172 (5th Cir.1983); *Parker v. Anderson,* 667 F.2d 1204, 1209 (5th Cir.), *cert. denied,* 459 U.S. 828, 103 S.Ct. 63, 74 L.Ed.2d 65 (1982).

■ Other factors which may be considered are whether the settlement amount is significantly less than what was demanded in the complaint, whether the defendant can pay a greater amount and the number and nature of the objections to the settlement. *In re Catfish Antitrust Litigation,* 939 F.Supp. 493 (N.D.Miss.1996).

■ In this case, the parties have estimated that approximately 28.5 million shares of Hibernia stock were damaged by the alleged wrongdoing.[1] Nearly 6,500 proofs of claim

---

1. The court notes that Hibernia and the other

defendants steadfastly deny any wrongdoing or

have been filed, with slightly over 5,000 proofs found eligible for participation, accounting for approximately 10 million or 30% of the estimated damaged shares. If all of the $20 million were allocated to the claims, the return would be approximately 70 cents per share. If the attorneys were to be awarded their full request for attorneys' fees and expenses, the return would drop to approximately 40 cents per share.

Turning to the proposed settlement, the court finds as follows [2]:

(1) *Fraud; Collusion:* The court finds absolutely no evidence or even an inkling of fraud or collusion in the settlement. On the contrary, the matter has been litigated aggressively by both sides, with hotly contested discovery matters that traveled twice to the Fifth Circuit Court of Appeals. After their own attempts at settlement failed, the parties themselves requested the assistance of a judicial officer in the negotiations. As previously noted, Magistrate Africk was actively involved in the subsequent settlement discussions and played a pivotal role in their resolution.

This factor-favors approval of the settlement.

(2) *Complexity; expense; duration of litigation:* This case is factually and legally complex. The question of liability was complicated, involving, among other issues, whether the statements and disclosures made by the defendants were in fact false and misleading; whether Hibernia's procedures in handling its loan portfolio and its loss reserves were appropriate; whether each of the defendants knew or recklessly failed to learn that the loan reserves were insufficient; and whether the allegedly inadequate reserves in fact impacted on the truth of Hibernia's financial statements. Deciding those issues would have required review of numerous and complex corporate transactions, an understanding of accounting, banking and regulatory procedures and resolving conflicting expert testimony. Assuming liability, the calculation of damages would also be complex. Thousands of class members bought their stock at different times during the class period. Issues of what the defendants said and when and how it affected the value of the stock would have to be resolved. All of this would have called for a lengthy and expensive trial, with the losing side virtually certain to appeal.

This factor supports approval of the settlement.

(3) *Stage of Proceedings:* The settlement was reached just a few weeks before trial after over four years of litigation. Virtually all of the discovery had been completed, including numerous interrogatories, 27 depositions and review of voluminous amounts of documents. Liability and expert reports had been exchanged. Informed settlement negotiations had been ongoing for some time. Both sides were fully aware of the strengths and weaknesses of their case and the advantages and risks of going to trial.

This factor supports approval of the settlement.

(4) *Factual and legal obstacles:* As noted above, this litigation involved complex factual and legal issues. The plaintiffs faced other legal issues as well which were likely to appear at trial and/or on appeal, such as the previously rejected motion to dismiss questioning whether Hibernia's actions were even actionable under federal securities law and whether a critical examination report of Hibernia by the Comptroller of the Currency and the resulting Consent Order between the bank and OCC would be admissible in evidence.

This factor supports approval of the settlement.

(5) *Possible range of recovery/certainty of damages:* Even if liability was established, the possible range and certainty of recovery were in dispute. As already noted, this complaint spanned a class period of over a year, involving thousands of investors and over 28

---

liability in this case and have made such denials a part of the settlement agreement. They state that they have elected to enter into the settlement as the best means to fully and finally end this already protracted and expensive litigation.

**2.** Both sides ably briefed the appropriateness of the proposed settlement prior to its preliminary approval. Rec. Docs. 265 & 266.

million shares of stock. The parties disagreed dramatically on what the defendants knew and were required to disclose at different periods during that time, whether they made appropriate corrective disclosures and how all of that information or lack of information impacted on the worth of the shares. They also disagreed on how independent factors affected the value of the stock. Plaintiffs' expert estimated damages as between $80 and $100 million. The defense expert estimated the damages to be between $17 and $25 million.

This factor supports approval of the settlement.

(6) *Opinions of the participants:* No objections to the settlement were lodged prior to or during the initial Fairness Hearing in February, 1996. Prior to the second Fairness Hearing in April, 1997, an objection to both the settlement and the allocation of attorneys' fees was filed on behalf of several class members[3]. The objection to the settlement itself was subsequently withdrawn. At the time of the second Fairness Hearing, the only remaining objections were to the attorney fee and expense allocation.

This factor supports approval of the settlement.

With respect to other factors, the settlement figure represents 20–25% of what the plaintiffs' experts estimated the damages to be; Hibernia had the financial capacity to pay a greater amount if necessary; and, as already noted, no one had lodged an objection to the settlement itself.

In light of all the above considerations, the court finds the proposed settlement to be fair, adequate and reasonable to the class and therefore approves the settlement.

### III.   PLAINTIFFS' ATTORNEYS FEES

Having approved the settlement, the next issue is the amount of compensation to plain-

tiffs' counsel and reimbursement for costs and expenses. Under the settlement, the money available to the class members consists of the $20 million settlement fund, less the attorneys' fees and expense allocation[4]. Plaintiffs' counsel of course are interested in obtaining as high a fee award as possible, which places them in a potential conflict with class members whose share in the settlement will be correspondingly reduced. The defendants have no financial interest in how the fees are determined, since the fees will come from the common fund. Consequently the court must act as a fiduciary for the class members to insure that the division is fair to them. *Bowen v. Southtrust Bank of Alabama,* 760 F.Supp. 889 (M.D.Ala.1991).

■ The Fifth Circuit determines attorneys' fees in class action cases by the "lodestar" method. *Longden v. Sunderman,* 979 F.2d 1095 (5th Cir.1992). Under that procedure, the number of hours "reasonably expended" in the litigation is multiplied by a "reasonable" hourly rate in the community for similar work. The lodestar can then be adjusted up or down depending on various other factors. *Longden, supra* at 1099; *Graves v. Barnes,* 700 F.2d 220, 222 (5th Cir.1983).

■ In determining the lodestar, the court is obliged to examine carefully the time records submitted and "exclude all time that is excessive, duplicative or inadequately documented." *Watkins v. Fordice,* 7 F.3d 453, 457 (5th Cir.1993). This is part of the court's fiduciary obligation towards the absent class members who cannot otherwise be protected from excessive or unreasonable attorney fee allocation.

*Time Computations*

(a) Hourly rates

■ Since this litigation took place in New Orleans and two of the law firms involved are

---

3.  Rec. Doc. 313.

4.  Rec. Doc. 267, # 7.1(b). The payment per share is determined by dividing the Distributable Consideration by 28.5 million, which is the agreed upon estimation of the number of damaged shares. The amount of money due a particular claimant is determined by multiplying the payment per share by the number of shares that claimant purchased during the class period. Rec. Doc. 267, # 7.2. The amount due a claimant is not affected by how many other claims are filed. It is very much affected, however, by the amount of the attorneys' fees and expenses that are taken off the top of the $20 million.

based in New York, the first issue is whether the hourly rate for those firms should be based on New Orleans or the standards in their own locale. The court is aware of jurisprudence holding that the appropriate standard is the rate in the judicial district where the court sits. *Maywalt v. Parker & Parsley Petroleum Co.*, 864 F.Supp. 1422 (S.D.N.Y.1994), *aff'd*, 67 F.3d 1072 (2d Cir. 1995). For several reasons, however, the court finds those rates unduly restrictive to out of state counsel. At oral argument, the court learned that the named claimant, Gina Feinberg, a New Yorker herself, contacted the New York counsel to represent her. The law suit could have been brought in New York, jurisdictionally. The damaged stock of Hibernia at issue was traded on a national basis. Finally, New York counsel pays New York rates in maintaining their law practices. For those reasons, to restrict New York counsel to the prevailing hourly charges in the less expensive New Orleans market would be unduly unfair.

■ With respect to all counsel, the court is basing the hourly rates on counsel's reasonable 1995 charges, rather than the lesser hourly rates at the time some of the services were rendered. This is a common practice in protracted class action litigation and fairly compensates the firms for the loss of the use of that revenue in the interim. *See e.g., Graves, supra; Copper Liquor, Inc. v. Adolph Coors Co.*, 684 F.2d 1087, 1096, n. 26 (5th Cir.1982), *modified on other grounds*, 701 F.2d 542 (5th Cir.1983) (en banc), *overruled in part on other grounds* by *International Woodworkers of America v. Champion International Corp.*, 790 F.2d 1174 (5th Cir. 1986), *aff'd sub nom. Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987).

These two assumptions being made, the Court nevertheless must determine what is a "reasonable" hourly rate for each firm in this litigation.

With respect to the firm of Gainsburgh, Benjamin, David, Meunier, Noriea & Warshauer, the court finds that the hourly rate of $250[5] requested by counsel Benjamin; $225 by counsel Nick Noriea; $80 for litigation specialists Joyce Ludwig and Justin Woods and $60 hourly rate for paralegal Alisa Early to be reasonable in light of the court's familiarity with the New Orleans legal market.

The court finds that the hourly rates requested by the firms of Stull, Stull & Brody and the firm of Weiss & Yourman should be reduced as follows[6]:

### Stull, Stull & Brody

| | |
|---|---|
| Jules Brody | $420 |
| Mark Levine | $350 |
| Melissa Emert | $300 |
| Patrick Slyne | $300 |
| Robert Susser | $225 |
| Caroline Camhy | $180 |
| Aaron Brody | $110[7] |
| Tzivia Brody | $110 |
| Paralegals | $110 |

### Weiss & Yourman

| | |
|---|---|
| Joseph Weiss | $420 |
| Moshe Balsam | $330 |
| David Katz | $240 |
| Fred Nagel | $310 |
| Jack Zwick | $180 |
| Mel Lifshitz | $320 |
| Mark Smilow | $180 |
| Kevin Yourman | $360 |
| Joseph Cohen | $250 |
| Sandy Liebhard | $320 |

5. Counsel Benjamin submitted 117.25 hours at a higher rate of $290 per hour for work subsequent to the first Fairness Hearing. While the court recognizes that his hourly rate increased that year, $250 is still the more appropriate rate. The post-hearing work was not complex and it was not the fault of the class that a second Fairness Hearing was necessary.

6. The court's recalculations is drawn from several sources of information: caselaw from the Southern District of New York dealing with allocation of attorneys' fees and expenses in class

actions in that locale; the 1996 Lawyer's Almanac setting forth hourly rates for various named firms in the New York area; and Martindale–Hubbell to determine those firms' similarity to the firms in this case. The court has also reviewed the court record in detail and researched the general area of attorney fee allocations in class action litigation.

7. Aaron and Tzivia Brody were law students in June, 1994, when they spent approximately 98 hours "digest(ing) documents" for the case. They apparently had no further involvement.

| | |
|---|---|
| Jerry Silver | $110 |

**(b) Number of hours reasonably spent**

All three firms have submitted time sheets representing the number of hours purportedly spent on this litigation.

At the outset, the court commends all counsel for their judicious use of resources in terms of depositions and court-related appearances. In nearly all instances, no more than two lawyers were present [8]. *In re Prudential–Bache Energy Income Partnerships Securities Litigation,* 1994 WL 202394 (E.D.La.1994). The court also commends the firm of Stull, Stull & Brody for the extensive use of paralegals rather than attorneys for various tasks, reducing the cost of litigation. Finally, the court commends the firm of Gainsburgh, Benjamin, David, Meunier, Noriea & Warshauer for consistently detailing the topic of conferences and conversations in their time record submissions.

The time records nevertheless suffer from basic deficiencies, making court review difficult. The New York firms over-used block entries, listing several tasks allegedly done within one block of time without differentiating how much time was spent on each task. In addition, those firms reported time spent in telephone conversations without specifying what the conversation concerned. Finally, those firms over-used vague and general terms such as "document production," "document review" without specifying what was being referenced. Since the burden is upon the firms to justify their time and expenses, these lapses in detail are to their detriment. *In re Prudential–Bache, supra.*

In terms of credit for time spent, the court makes the following general determinations:

1. With respect to conferences between counsel, both within and between the law firms, each attorney is given full credit, rather than a reduced time share. Consultation and "sound-boarding" among attorneys is valuable to effective litigation and the conferences in this case did not appear to be excessive.

2. Time spent in travel has been reduced by approximately half. The court recognizes that work is done in transit, but also recognizes the inevitable disruptions of travel. *In re Washington Public Power Supply System Securities Litigation,* 779 F.Supp. 1063 (D.Ariz.1990), *vacated in part on other grounds,* 19 F.3d 1291 (9th Cir.1994) and *aff'd in part by Class Plaintiffs v. Jaffe & Schlesinger,* 19 F.3d 1306 (9th Cir.1994).

3. Time spent in "copying documents" has been eliminated as a clerical task.

4. In addition to the above, the court is concerned over the apparent "re-billing" of the time allegedly spent in preparing and arguing the third motion to compel, time which was previously compensated by order of the court as a sanction against the defendant. At oral argument, counsel represented that the amount previously paid was deducted from expenses. Only the expenses were apparently deducted. However, expenses are a small sum compared to the attorneys' fees claimed. This duplication indicates at best carelessness in the time-keeping or at worse a deliberate attempt to pad the billing. In either case, it does not inspire confidence in the accuracy of time sheets. Those amounts have been deducted from the time reported by each firm [9].

5. Time spent relating to the attorneys' fee application is not compensable, since it only benefits counsel and not the class. This includes much of the time spent in preparation for and attending the second Fairness Hearing.[10] *See In re Prudential–Bache, supra.*

---

8. The court had been concerned over the appearance of local counsel Jack Benjamin at most of the depositions, since he did not participate in the questioning. At oral argument, it was explained that Mr. Benjamin was intended to be lead counsel at the trial itself. This justifies his presence at the depositions.

9. Counsel Jules Brody billed 3.25 hours for the third motion to compel; counsel Jack Benjamin billed 7 hours and the Weiss firm billed a total of 47.50 hours. All those hours have been eliminated.

10. As a practical matter, only counsel Benjamin's hours were reduced. He presented time sheets for a total of 117.25 additional hours of work after the first Fairness Hearing, of which 19.75 was connected to the challenge to the attorneys' fees. Counsel Brody had only antici-

With those general assumptions made, the following are the hours found to be reasonably spent by each of the law firms involved, multiplied by the hourly rates set above to determine the lodestar.

Gainsburgh, Benjamin, David, Meunier, Noriea & Warshauer

| | | |
|---|---|---|
| Jack Benjamin | 910.95 [11] | $227,737.50 |
| Nick Noriea | 4.00 | $     900.00 |
| Joyce Ludwig | 59.40 | $   4,752.00 |
| Justin Woods | 419.15 [12] | $  33,532.00 |
| | 1,393.50 | $266,921.50 |

Stull, Stull & Brody

| | | |
|---|---|---|
| Jules Brody | 993.00 [13] | $417,060.00 |
| Mark Levine | 2.00 | $     700.00 |
| Melissa Emert | 26.00 | $   7,800.00 |
| Patrick Slyne | 2.00 | $     600.00 |
| Robert Susser | 278.00 | $  62,550.00 |
| Caroline Camhy | 8.00 | $   1,440.00 |
| Aaron Brody | 47.50 | $   5,225.00 |
| Tzivia Brody | 59.00 | $   6,490.00 |
| Michael Morgan | 10.00 | $   1,100.00 |
| Pamela Woodies | 136.00 | $  14,960.00 |
| M.Manville | 428.00 | $  47,080.00 |
| David Cooper | 476.00 | $  52,360.00 |
| Cathy Mucerino | 44.50 [14] | $   4,895.00 |
| Liz Ayad | 20.50 | $   2,255.00 |
| Felix Mucerino | 26.00 | $   2,860.00 |
| | 2,556.50 | $627,375.00 |

*Weiss & Yourman*

The law firm of Weiss & Yourman served as lead counsel in this case. As with the Brody firm, time spent in clerical tasks has been deleted and time spent in travel has been reduced by half. With the modification stated above, the recomputed time and lodestar for the members of the Weiss & Yourman firm, other than Joseph Weiss and Moshe Balsam, are as follows:

| | | |
|---|---|---|
| David Katz | 686.50 [15] | $164,760.00 |
| Fred Nagel | 615.75 | $190,882.50 |
| Jack Zwick | 470.25 | $  84,645.00 |
| Mel Lifshitz | 152.25 | $  48,720.00 |
| Mark Smilow | 126.50 | $  22,770.00 |
| Kevin Yourman | 67.50 | $  24,300.00 |
| Joseph Cohen | 45.25 | $  11,312.50 |
| Sandy Liebhard | 43.50 | $  13,920.00 |
| Jerry Silver | 331.00 | $  36,410.00 |

With respect to Joseph Weiss and Moshe Balsam, the court is concerned about excessive hours considering the unquestioned expertise of these two attorneys in securities law. By its own self-description, the firm has litigated "hundreds of stockholder class actions brought for violations of federal securities law ..." [16] That expertise should have resulted in the firm, and in particular Mr. Weiss and Mr. Balsam, handling the litigation with particular efficiency and speed. Similarly, it appears that some of the matters handled by them could have been handled by other members of the firm at a lesser hourly rate.

■ For much of the time claimed, such as for preparation for depositions or review-

pated a total of 50 hours of additional work after the first Fairness Hearing, less than half that of Mr. Benjamin. He has not submitted any revision and no reduction is necessary in light of his lower initial estimate. Mr. Weiss anticipated 75 additional hours of work after the first hearing. As will be seen, other modifications are being made to all of Mr. Weiss' claimed hours, and in light of that, no further reduction will be deemed necessary on this particular issue. The expenses associated with the second Fairness Hearing have not been deducted from any of the firms.

11. The following hours were eliminated: 7 hours in connection with the third motion to compel; approximately 3 hours in connection with the fee and expenses of the third motion to compel; approximately 6.5 hours in tasks that were quasi-clerical, i.e. faxing, telephone calls with the party not in; 19.75 hours in connection with the objections to the attorney fees and expenses and the second Fairness Hearing on those issues; 3.5 hours in travel (a 50% reduction of time) and 2 hours in telephone calls (a 25% reduction for calls exceeding 30 minutes).

12. Woods' time computations reflected a 3 hour deletion for travel and 24.25 deletion for work in

connection with the objections to the attorneys' fees and expenses.

13. In addition to a 50% reduction for travel time, 3.25 hours purportedly spent in connection with the third motion to compel have been eliminated as previously compensated.

14. In addition to eliminating time spent on copying as clerical, 6.0 hours spent on 7/24/92 for copying documents and "organize file" was eliminated in its entirety as 15 hours had already been purportedly spent in the prior 10 days to "(o)rganize file."

15. In addition to travel time, the court eliminated reported time spent in connection with the deposition of Gerald Pavlas. Unlike other depositions where at most two attorneys attended, four plaintiff's attorneys attended this deposition—two from the Weiss firm, one from the Brody firm and Jack Benjamin. Katz' time has been eliminated as duplicative.

16. Rec. Doc. 269.

ing of documents, the court is not in a position to evaluate the reasonableness of the claimed hours. For other blocks of time, an evaluation is possible which can then be extrapolated to the remainder of the hours claimed. With this in mind, the court reviewed (1) the preparation of the original petition and (2) the preparation of the initial opposition to the motion to dismiss[17].

The original petition, styled a "class action complaint for violations of federal securities law," was filed on October 23, 1990. Other than the specific factual allegations, it was strikingly similar in language and scope to at least a dozen other law suits filed by this same New York counsel[18]. These law suits alleged violations of similar if not identical federal statutes, cited the same jurisdictional and venue foundations, and were even based on the same general factual allegations -that inadequate loan loss reserves coupled with the financial institution's overly rosy public pronouncements about its condition and future constituted a fraud upon the investors. The only substantive differences were the specific factual misrepresentations allegedly made, most, if not all of which, are quotes from newspaper articles, public reports of the institution and press releases from the company.

Despite these striking similarities, plaintiff counsel generally reported spending a total of *90* hours in preparation of the original petition. Weiss & Yourman accounted for 72 hours or 80% of that time, with Mr. Weiss and Mr. Balsam accounting for 36 hours each. This amount of time for preparation of the petition is unreasonable and excessive.

With respect to the motion to dismiss, the defendant filed the motion on January 22, 1991. The original opposition was filed less than a month later, on February 20, 1991. Motions to dismiss, of course, are legal arguments based on the petition. Various arguments were presented by the defendants, which were responded to by the plaintiffs in their opposition. The plaintiffs' opposition made clear that the allegations in their petition were not novel to securities litigation, nor were the legal arguments being made by the defendants in their motion to dismiss unique or surprising. The plaintiffs described their petition as "firmly within the mainstream of modern securities fraud litigation" and their complaints as "protypical securities claims of the kind that have time and again been held sufficient under Section 10(b)."[19] The plaintiffs also described their complaints as "recognized securities fraud claims, typical of the kinds of claims routinely upheld by federal courts"; and argued that "(c)ourt after court" has rejected the specific arguments being made by the defendant[20].

Even allowing for attorney hyperbole in the argument, it does appear that the issues raised by the defendants were in fact familiar to securities litigation. Likewise, as has already been pointed out, the plaintiffs' petition was virtually identical to a number of other law suits previously filed by these same plaintiffs' New York firms. Consequently, responding to his motion should not have involved a considerable expenditure of time. Nevertheless, plaintiffs' counsel reported a total of 217 attorney and 10 paralegal hours of preparation. Of that total of 237 hours, 190 hours or 80%, was claimed by the Weiss law firm. Joseph Weiss accounted for 65.5 of those hours and Moshe Balsam 44.45. This expenditure of time purportedly took place within a span of just a few weeks. Again, considering the expertise of Mr. Weiss and Mr. Balsam, the court finds this amount of time to be unreasonable and excessive.

Reducing the time and extrapolating that reduction throughout the time sheets submitted by these two individuals is necessarily discretionary and to some extent arbitrary.

17. This method of sampling a portion of the litigation and extrapolating to the larger case has been approved. *Harman v. Lyphomed Inc.*, 945 F.2d 969 (7th Cir.1991).

18. These other law suits are attached as exhibits to defendant's Reply Memorandum to their Motion to Dismiss. Rec. Doc. 14.

19. Rec. Doc. 12, pp. 10 & 11.

20. Rec. Doc. 12, pp. 1 & 12.

As already noted, various aspects of their time sheets are incapable of court review for reasonableness. The best that can be done is make an evaluation, as here, on sampled portions and then extrapolate. The court has tried several mechanisms—from a draconian but simple halving of all the time submitted by Mr. Weiss and Mr. Balsam—to fashioning some combination of elimination and reduction in hourly rate. While no solution is entirely satisfactory, the following adjustment has been made. After eliminating travel time and time spent on the third motion to compel, previously compensated, Mr. Weiss' time stands at 1,844.50 hours and Mr. Balsam's at 1,508 hours. One half of that time is accepted at the reasonable hourly rate of $420 for Mr. Weiss and $330 for Mr. Balsam as previously set forth above. One fourth of their time is assessed at an hourly rate of $290 which is the average of all the Weiss' attorney hourly rates as set forth above. The remaining one quarter is eliminated as excessive. The recalculation is as follows:

Mr. Weiss

| | |
|---|---|
| 922.25 hours at $420 | $387,345.00 |
| 462 hours at $290 | $133,980.00 |
| | $521,325.00 |

Mr. Balsam

| | |
|---|---|
| 754 hours at $330 | $248,820.00 |
| 377 hours at $290 | $109,330.00 |
| | $358,150.00 |

The total lodestar then for the Weiss & Yourman law firm is: $1,477,195.00

The total lodestar for all three firms is $2,371,491.50.

Having determined the lodestar, the next issue is whether that amount should be increased or decreased for any reason. Plaintiffs' counsel argue that they are entitled to an enhancement by a factor of 2.18 for various stated reasons [21].

■ The Fifth Circuit has repeatedly held that the lodestar "is presumptively reasonable and should be modified only in exceptional cases." *Watkins*, 7 F.3d at 457;

*Graves, supra.* In determining whether to adjust the lodestar upward or downward, the appellate court has set forth specific factors to consider. *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974), *overruled on other grounds, Blanchard v. Bergeron*, 489 U.S. 87, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989). Those factors, counsel's argument and the court's conclusion are as follows:

■ *The novelty and difficulty of the questions:* The basic complaint in this case—alleged fraudulent disclosures regarding lost loan reserves impacting the value of investments—is not new or novel in securities litigation, nor new or novel to these attorneys. Nevertheless, counsel argues that an upward adjustment in the lodestar is justified because this case presented unique issues, such as reconstruction of Hibernia's loan files and litigation of novel issues of privilege and confidentiality. The firms did not in fact reconstruct the loan files themselves; that task was undertaken by an accounting firm retained by counsel which will be handsomely paid for its efforts. The court is familiar with the issues of privilege and confidentiality that arose in this case and finds neither to be particularly complex, even assuming, without deciding, that they were of first impression. An upward adjustment in the lodestar on this basis is not appropriate.

*The skill requisite to perform the legal service properly:* The court has already awarded the attorneys high hourly rates to acknowledge their greater experience and ability in securities litigation. The Fifth Circuit has stated that an enhancement or reduction in the lodestar on the basis of legal skills is justified only if the caliber of work was above or below that expected of attorneys of the caliber reflected in the hourly rate. *Graves*, 700 F.2d at 223; *see also In re Washington, supra.*

The plaintiffs argue that an upward adjustment is warranted because of the amount of the settlement, claiming that similar class actions have yielded much lower judgments. Counsel fails to cite any specific cases, and even if cited, the court finds such compari-

**21.** Rec. Doc. 281.

sons unhelpful as each case depends on its own unique legal and factual issues. Furthermore, counsel concedes that the settlement here reflects only 20–25% of the claimed damages, which while certainly adequate does not indicate exceptional results. An upward adjustment is not appropriate for this factor.

*The preclusion of other employment:* Counsel candidly concedes that they were only minimally precluded from other employment and therefore a lodestar adjustment is not suitable on this basis.

*The customary fee:* The Fifth Circuit recognizes that different types of legal work in a community command different scales of compensation. The court has recognized the complexity of securities litigation by awarding counsel with the higher hourly rate of compensation appropriate for the locale of their firm. Counsel argues for an upward adjustment because fees in contingency cases are usually awarded on a percentage basis rather than at an hourly rate and because the defense attorneys for Hibernia were apparently paid a substantial amount. Regardless of what may usually occur elsewhere, the Fifth Circuit abides by the lodestar method, which is based on actual work performed and not on a percentage. With respect to defense counsel, the defendants presumably knowingly bargained for that representation. Even if they acquiesced in excessive defense fees, that does not justify saddling the voiceless class claimants with a comparable debt. No lodestar adjustment is justified on this basis.

▇▇ *Whether the fee is fixed or contingent:* The representation in this case was undertaken on a contingent basis. In assessing the contingency multiplier, the Fifth Circuit has adopted several factors to consider: (1) the plaintiff's factual and legal burdens in the case; (2) the risks assumed in developing the case; (3) the delay in receipt of payment for services rendered. *Graves, supra.* With respect to the first factor, the court does find that this was a complex case to factually develop and prove, due to the volume of documents involved, the multitude of transactions and the intricacies of banking, accounting and regulatory law. Success for the plaintiff hinged on a jury finding of scienter or knowledge on behalf of the defendants, a state of mind which would have had to be established circumstantially. The plaintiffs' theory was not novel, but it was breaking fresh ground with respect to this particular defendant. Had liability been established, the calculation of damages would also have been complex.

With respect to the second factor, the court finds that counsel did undertake substantial risk in litigating this case. In order to truly evaluate the merits of the complaint, voluminous discovery was necessary, entailing expensive and time-consuming efforts on the part of counsel and their retained experts. This commitment of time and significant out-of-pocket expense had to precede any meaningful settlement discussions. The litigation also involved repeatedly disputed discovery requests and motions to compel, adding to the time and expense of the litigation. The third factor, delay in receipt of payment, is marginally applicable since hourly rates from 1995 were used and we are now in 1997. Nevertheless, it is not the fault of the class that another Fairness Hearing was considered necessary. The early setting of the initial hearing was done at the urging of counsel, and while undoubtedly urged in good faith, that early setting was unrealistic considering the steps needed to be followed to notify the class members.

The court does find, however, that an upward adjustment in the lodestar is overall justified on this basis. In particular, the court notes the words of Judge Marcel Livaudais, Jr. of this court in a similar context:

In complex securities class actions and shareholder derivative litigation, able counsel for plaintiffs can be retained only on a contingent basis. A large segment of the investing public would be denied a remedy for violations of the securities laws and breaches of fiduciary duty by public companies and those entrusted with their stewardship if contingent fees awarded by the courts did not fairly and adequately compensate counsel for the services provided, the serious risks undertaken and the delay before any compensation is received. Filing of contingent lawsuits in this con-

nection should not be chilled by the imposition of fee awards which fail to adequately compensate counsel for the risks of pursuing such litigation and the benefits which would not otherwise have been achieved but for their persistent and diligent efforts. *In re Prudential–Bache,* 1994 WL 202394 at *7.

The court finds that a multiplying factor of 1.44 is appropriate. *See In re McDonnell Douglas Equipment Leasing Securities Litigation,* 842 F.Supp. 733 (S.D.N.Y.1994).

*Time limitations imposed by the client or the circumstances:*

Counsel argues that an upward adjustment is warranted because of the overall work that went into the case. Those factors have been taken into account in the time computations. No further adjustment is necessary.

*The amount involved and results obtained:* Counsel again argues, without citation to other cases, that the settlement of $20 million was exceptional and warrants an upward adjustment. Counsel for the objectors point out that the settlement reflects only 20–25% of the plaintiffs' claimed damages and falls midway in the defendants' estimate, assuming liability was established. The court finds that an upward adjustment is not warranted.

*The experience, reputation and ability of the attorneys:* The Fifth Circuit has stated that the fee scales usually reflect the experience differential of the attorneys. If an attorney is exceptional, however, even within his pay range, an upward adjustment may be appropriate. Counsel argues that this exception applies here. The court finds that the attorneys did work commensurate with their high level of ability and experience, as already reflected in the hourly rate allotted. A further upward adjustment on this basis is not appropriate.

*The "undesirability" of the case:* The Fifth Circuit has used the community unpopularity of some civil rights litigation as an example of the ostracism and economic impact such a case can have on a local lawyer. Counsel argues that "undesirability" applies in this case basically because of the time and resource commitment required and the uncertainty of success. This has been ade-quately considered in awarding an upward adjustment due to the contingent nature of the law suit. No further adjustment is warranted for this factor.

*The nature and length of the professional relationship with the client:* Counsel candidly concedes that they have not represented this client in any other case, so no additional adjustment in the lodestar is justified.

*Awards in similar cases:* Counsel has cited various common fund cases in which awards of what amounts to 17.5% to 40% have been awarded. The ultimate calculation in this case does fall within that range.

With the multiplier of 1.44, the attorneys' fees to be awarded are as follows:

| Gainsburgh, Benjamin, David, Meunier, Noriea & Warshauer | $ 384,366.96 |
|---|---|
| Stull, Stull & Brody: | $ 903,420.00 |
| Weiss & Yourman: | $2,127,160.80 |

### IV. PLAINTIFFS' ATTORNEYS' EXPENSES

The next figure to be allocated is the plaintiffs' attorneys' costs and expenses. The court commends in particular Stull, Stull & Brody for the clarity of their calculations and supporting documents.

█ As a general rule, as long as the expense was documented it was accepted by the court, with the following exceptions: (1) in-house copying and faxing was reduced by 50%, to approximate actual cost. *Gottlieb v. Wiles,* 150 F.R.D. 174 (D.Colo.1993), *rev'd on other grounds,* 43 F.3d 474 (10th Cir.1994); *In re Painewebber Securities Litigation,* 1994 WL 416020 (S.D.N.Y.1994); (2) staff overtime was eliminated. *In re McDonnell Douglas, supra; In re Dime Savings Bank of New York Securities Litigation,* 1994 WL 60884 (E.D.N.Y.1994).

*Gainsburgh, Benjamin, David, Meunier, Noriea & Warshauer*

Attorney Jack Benjamin originally claimed $92,845.51 in expenses, which included an estimated $10,000 in future costs. Since that time, he submitted a more current accounting which claims $8,609.29 rather than the

estimated $10,000, for a revised total of $91,-454.80. The claims have been adequately documented. The in-house copying and faxing costs have been divided by 50%, which amounts to a reduction of $8,462.30.

The balance of $82,992.50 is approved.

*Stull, Stull & Brody*

Stull, Stull & Brody submitted a total request for $79,927.80 in expenses, all of which were adequately documented. The court has reduced the $5,000 estimated expense for in-house copying by 50% and also eliminated $750 for a subscription to *American Banker.*

The balance of $76,677.80 is approved.

*Weiss & Yourman*

Weiss & Yourman submitted an initial request for expense reimbursement of $1,011,-216.34, with documentation attached. Some of that documentation was inadequate to sustain the expenses claimed, but subsequent information has been obtained from Weiss & Yourman to explain many, if not all, the disputed expenses.

The following modifications have been made: (1) elimination of secretarial overtime (a reduction of $3,840); (2) a 50% reduction in the estimated in-house copying (a reduction of $9,349.90); (3) a 50% reduction in telephone/telecopying (a reduction of $6,000); (4) a reduction from $5,000 to $3,000 in the estimated future expenses [22]. This totals $22,189.90 in reduced expenses.

The balance of $989,026.44 is approved.

The total amounts to be paid from the settlement funds for attorneys' fees and expenses are as follows:

| | |
|---|---|
| Gainsburgh, Benjamin, David, Meunier, Noriea & Warshauer | $ 467,359.46 |
| Stull, Stull & Brody | $ 980,097.80 |
| Weiss & Yourman | $3,116,187.24 |
| TOTAL: | $4,563,644.50 |

**22.** The firm initially estimated $5,000 in future expenses but more recently submitted photocopies of what in fact was spent with no itemized total. Much of the copies, unfortunately, are illegible and/or unexplained.

## IV. CLAIMANTS' SHARE

According to the settlement agreement, the pool of funds for the claimants is the $20 million, plus interest, minus the plaintiffs' attorney fees and expenses. Consequently, the above totals are the *only* amounts to be deducted from the settlement fund prior to the claimants obtaining their pro rata share.

*This balance is to be used as the basis for determining each claimant's share. After that determination is made, the following additional expenses are to be deducted from the remaining balance of funds. These following expenses are not to be deducted prior to the claimant's share being determined and are not in any way to reduce the claimants' pro rata portions.*

## V. COSTS OF CLAIMS ADMINISTRATION

The accounting firm of David Berdon & Co. LLP has submitted an invoice for services already rendered and anticipated to be rendered as Claims Administrator in this case. After deducting the $200,000 already paid by Hibernia, the amount due is $487,-206.91. The amount is adequately documented and is therefore approved. That amount is to be deducted from the balance of the settlement fund remaining, only *after* the claimants' shares have been determined.

## VI. ATTORNEYS' FEES AND EXPENSES OF OBJECTING CLAIMANTS

James J. Eccleston, counsel for three claimant objectors, has submitted a bill for attorneys' fees and costs in connection with contesting the attorney fee and costs for plaintiffs' counsel [23]. The court finds the suggested hourly rates for his firm and that of local counsel, as well as the time spent in the representation, to be adequately documented and reasonable. Mr. Eccleston's lodestar is $25,106.25; that of his law clerk, $8,670.00, and that of local counsel, $1,482.50. Objectors' counsel request that its lodestar

**23.** Rec. Doc. 325.

be enhanced either by a factor of two or that it be awarded 10% of the savings the objectors have brought to the class.

 While the court disagreed with much, if not most, of the positions taken by the objectors, the court found the arguments of the objectors to be helpful in focusing on some of the issues in this case, such as the hourly rates for counsel and the propriety of certain expenses. Just as it is important for attorneys to be adequately compensated in representing a class on a contingency basis, likewise it is important to adequately compensate those lawyers who, also on a contingency basis, are willing to challenge arguably excessive fee claims by those class counsel. The same enhancer that the court applied to class counsel, that of 1.44, will likewise be applied to the objectors. As a result, Eccleston & Associates are entitled to a fee of $48,637.80, plus $1,584.19 in expenses. Local counsel, L. Kevin Coleman, is entitled to $2,134.80, plus $102.55 in costs.

As with the fee to Berdon & Co., these amounts are to be paid from the residue in the fund *after* the claimants' portion has been determined.

## VIII. THE BALANCE OF THE SETTLEMENT FUND

Pursuant to the settlement agreement, the balance of the settlement fund, after all the above deductions are made, is to be returned and/or retained by the defendants.

It is therefore ORDERED that:

1. The settlement reached between the parties is APPROVED.

2. Attorneys' fees and expenses are to be paid from the settlement fund in the following amounts:

| | |
|---|---|
| Gainsburgh, Benjamin, David, Meunier, Noriea & Warshauer | $ 467,359.46 |
| Stull, Stull & Brody | $ 980,097.80 |
| Weiss & Yourman | $3,116,187.24 |
| TOTAL: | $4,563,644.50 |

3. After those funds are deducted, the portions of the settlement fund owed to the class claimants shall be determined.

4. *After* the class claimants' portion of the settlement fund has been determined, the following additional expenses shall be deducted from the remainder of the fund:

| | |
|---|---|
| David Berdon & Co. LLP | $487,206.91 |
| Eccleston & Associates | $ 50,221.99 |
| L. Kevin Coleman | $ 2,237.35 |

5. The remainder of the settlement fund shall be retained and/or returned to the defendants.

6. David Berdon & Co. LLP shall submit to the Court by June 16, 1997, a proposed itemization for disbursement of funds which reflects that disbursement has been calculated in accordance with this order. Additional time will be provided, if necessary.