In re BAUSCH & LOMB, INCORPORAT-
ED SECURITIES LITIGATION.

No. 94–CV–6270L.

United States District Court,
W.D. New York.

Oct. 28, 1998.

Timothy J. Perry, Mark C. Gardy, Lee Squitieri, Sandy Liebhard, Jon Plasse, Goodkind, Labaton, Rudoff & Sucharow, New York City, Matthew J. Fusco, Chamberlain, D'Amanda, Oppenheimer & Greenfield, Rochester, NY, Jules Brody, Stull, Stull & Brody, New York City, Patricia A. Hulley, Bausch & Lomb Incorporated, Rochester, NY, John F. Savarese, David Gruenstein, Kevin S. Reed, David J. Lurie, Wachtell, Lipton, Rosen & Katz, New York City, for Plaintiffs.

Maxine Yi Hwa Lee, Carolyn G. Nussbaum, Nixon, Hargrave, Devans & Doyle, LLP, Rochester, NY, for Defendants.

## DECISION AND ORDER

LARIMER, District Judge.

## INTRODUCTION

Plaintiffs commenced this securities fraud class action on June 6, 1994 against Bausch & Lomb, Inc. ("B & L") and five individuals, all of whom are or were officers of B & L. The gist of plaintiffs' claims was that defendants had for some time artificially inflated B & L's stock price by concealing from the public certain financial problems that it was undergoing, and that when the truth was finally revealed, B & L's stock price dropped, causing investors to lose money.

After the complaint had been amended several times, defendants moved to dismiss in late January 1996. I denied that motion in a Decision and Order entered on October 24, 1996.

Not long thereafter, the parties began to engage in settlement discussions. Those negotiations eventually bore fruit, and on April 17, 1998, the parties filed a stipulation and agreement of compromise and settlement, providing for payment of $42 million to plaintiffs. On July 16, 1998, the court held a hearing on the parties' joint application for approval of the settlement and plaintiffs' attorneys' request for an award of attorneys' fees in the amount of $12.6 million and costs of over $608,000. Those applications are now pending before me.

## TERMS OF THE SETTLEMENT

The settlement agreement itself comprises over thirty pages of text, plus an additional forty-eight pages of exhibits, but the salient aspects of the agreement are as follows. Defendants have agreed to pay a settlement fund of $42 million ("the fund") to plaintiffs in exchange for dismissal of plaintiffs' claims. Seventy-five percent of the fund is to be allocated to "Class I," which consists of plaintiffs who purchased B & L stock between December 14, 1993 and June 3, 1994. The other twenty-five percent is to be allocated to "Class II," which is made up of plaintiffs who purchased B & L stock between June 4, 1994 and January 25, 1995. The fund is to be distributed among individual class members in accordance with one of several mathematical formulas, the details of which need not be set forth here, but which are intended to effectuate a pro rata distribution of the fund.

The agreement also provides a procedure by which any class member who has not opted out can submit a proof of claim. The claims are then to be reviewed by an independent settlement administrator, who will determine the extent to which each claim will be allowed, subject to appeal to this court.

The agreement further provides that plaintiffs' counsel may seek an award of attorneys' fees in an amount not to exceed one-third of the fund, plus counsel's actual out-of-pocket costs. Any fees and disbursements awarded by the court are to be paid out of the fund.

Pursuant to this court's Implementing Preliminary Approval Order entered on April 17, 1998, 1862 envelopes, each containing a notice and proof of claim form, were mailed to known class members, advising them of the proposed settlement. In response to inquiries from potential class members, an additional 4404 such envelopes were mailed. A notice was also published in the May 20, 1998 *Wall Street Journal.* Affidavit of Cheryl

Washington, Sworn to June 15, 1998, ¶¶ 3, 5, 6.

My April 17 order also provided that any objections to the terms of the settlement had to be filed with the court no later than fifteen business days prior to the July 16 hearing. None were received either before or after that date, and no one appeared at the hearing to object to the settlement. Counsel also informed the court at the July 16 hearing that only six class members had opted out.

## DISCUSSION

### I. Settlement of Plaintiffs' Claims

■ Rule 23(e) of the Federal Rules of Civil Procedure provides that no class action may be dismissed without the approval of the court. Among the factors that the court should consider in deciding whether to approve a proposed settlement of a class action are: "(1) the complexity, expense and likely duration of the litigation . . .; (2) the reaction of the class to the settlement . . .; (3) the stage of the proceedings and the amount of discovery completed . . .; (4) the risks of establishing liability . . .; (5) the risks of establishing damages . . .; (6) the risks of maintaining the class through the trial . . .; (7) the ability of the defendants to withstand a greater judgment . . .; (8) the range of reasonableness of the settlement fund in light of the best possible recovery . . .; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation . . . ." *County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1323–24 (2d Cir.1990); *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir.1974) ("*Grinnell I*"); *Chatelain v. Prudential–Bache Securities, Inc.*, 805 F.Supp. 209, 213 (S.D.N.Y.1992).

Having considered these factors in the case at bar, I conclude that the settlement of plaintiffs' claims (as distinguished from the application for attorneys' fees, which is discussed below) should be approved. Although as securities fraud cases go this one may not have been particularly complex, these types of cases are by their nature relatively complicated matters, and the litigation here would likely have consumed considerable time and money.

The reaction of the class strongly points in favor of approval of the settlement. As noted, not a single class member has objected to the proposed settlement, and only six have opted out.

The third factor—the stage of the proceedings and the amount of discovery completed—is relevant in two ways. First, there should have been enough discovery to present the court with sufficient information upon which to determine whether the settlement should be approved. At the same time, however, part of the reason that settlements are looked upon with favor is that they allow the parties to avoid engaging in protracted, costly discovery. Thus, "[b]ecause much of the point of settling is to avoid litigation expenses such as full discovery, 'it would be inconsistent with the salutary purposes of settlement,' to find that 'extensive pre-trial discovery is a prerequisite to approval' of a settlement." *Martens v. Smith Barney, Inc.*, 181 F.R.D. 243, 263 (S.D.N.Y.1998) (quoting *Handschu v. Special Servs. Div.*, 787 F.2d 828, 834 (2d Cir.1986), and *Plummer v. Chemical Bank*, 668 F.2d 654, 660 (2d Cir. 1982)).

In the instant case, there has been some discovery, but procedurally the case remains in its early stages. I believe that enough evidence has been produced, however, to provide a basis for determining whether the settlement should be approved. I also believe that settlement at this juncture will also avoid what would undoubtedly be extensive further discovery were this litigation to continue.

The attendant risks involved in this case—of establishing liability, damages, and maintaining the class throughout the trial—are also significant for both sides. As indicated by my prior decision denying defendants' motion to dismiss, plaintiffs have adduced some evidence in support of their claims, and if liability were established, the amount of damages could be substantial. At the same time, however, to establish liability, plaintiffs would have to prove scienter, i.e., defendants' knowledge that various statements made to the public about B & L's financial condition

were false. Absent some "smoking gun," such knowledge could be difficult to prove.

The $42 million fund is obviously not insubstantial, and it must also be viewed against the best possible recovery as well as all of the risks of litigation in this case. Although plaintiffs state that they considered $250 million to be the maximum possible loss sustained by both classes, the portion of that loss that plaintiffs would actually have been able to attribute to defendants' alleged fraud at trial would likely be significantly lower. Plaintiffs' counsel themselves concede that this figure was based on plaintiffs being able to attribute each and every penny of every price drop in B & L stock to defendants' conduct, and that *provable* damages were estimated to be in the neighborhood of $100 million. *See* Joint Affidavit in Support of Approval of the Proposed Class Action Settlement ¶ 45. In short, considering all of the risks faced by both sides in this case, I find that $42 million plus interest, which at the time of the July 16 hearing totaled $1,435,000, is quite favorable compared to the maximum possible recovery, and the possible risks of the litigation.

I conclude, therefore, that the proposed settlement in this case on the merits is both fair and reasonable, and that it should be approved.

## II. Attorneys' Fees and Costs

### A. Fees

Plaintiffs' counsel have requested the court to award them thirty percent of the settlement fund, i.e., $12.6 million, plus interest, as attorneys' fees, as well as $608,263.49 to reimburse them for their actual out-of-pocket expenses. For the reasons that follow, I conclude that the request for both fees and costs is excessive and cannot be approved. Counsel are entitled to compensation for the benefits that they achieved for the class. On the other hand, it is the class members who suffered loss, not the lawyers. A $12.6 million fee (thirty percent of the settlement) is not warranted on the facts of this case and such an award diminishes the recovery to the

injured class members. In my role as fiduciary, I cannot countenance such a fee award.

Courts have applied two different methods for determining attorney fee awards in "common fund" cases, in which the fees are paid from the fund created for the benefit of the class. Under the first method, the court simply awards a percentage of the total fund. The second is the "lodestar" method. Under this approach, the court multiplies the number of hours reasonably expended by counsel by the prevailing rate for the services provided. If the court finds it to be warranted, it may then also apply a multiplier to the lodestar to account for various factors such as the risks of litigation and the results obtained. *Grinnell I,* 495 F.2d at 470–71.

Although plaintiffs' counsel contend that the requested fee here is reasonable under either approach, the amount requested is clearly based on the percentage method, as they seek exactly thirty percent of the fund. Their memorandum of law also makes clear that plaintiffs' counsel prefer the court to use the percentage method rather than the lodestar method.

■■■ Although courts in other jurisdictions have utilized the percentage method, the rule is to the contrary in this circuit. The Court of Appeals for the Second Circuit has mandated use of the lodestar approach. The court adopted that method in *Grinnell I,* which remains binding precedent. *See Wallace v. Fox,* 7 F.Supp.2d 132, 138 (D.Conn. 1998); *In re PaineWebber Ltd. Partnerships Litigation,* 999 F.Supp. 719, 723–24 (S.D.N.Y.1998); *Berlinsky v. Alcatel Alsthom Compagnie Generale D'Electricite,* 970 F.Supp. 348, 350 (S.D.N.Y.1997); *In re Boesky Securities Litigation,* 888 F.Supp. 551, 561 (S.D.N.Y.1995); *see also Luciano v. Olsten Corp.,* 109 F.3d 111, 115 (2d Cir.1997) (applying lodestar method in Title VII action). The percentage of the fund that an award represents may, however, be considered as some indication of the reasonableness of the award. *See, e.g., In re Prudential Securities Inc. Ltd. Partnerships Litigation,* 912 F.Supp. 97, 102 (S.D.N.Y.1996).[1]

1. I recognize that there are some reported cases from the Southern District of New York that have used a percentage approach, either singly or in combination with the lodestar approach.

■ The lodestar figure is arrived at by multiplying the number of hours reasonably expended by counsel by a reasonable hourly rate. *Luciano,* 109 F.3d at 115; *Grinnell I,* 495 F.2d at 471; *Berlinsky,* 970 F.Supp. at 350. The lodestar figure should be in line with the rates "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum v. Stenson,* 465 U.S. 886, 896 n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984).

■ Once the lodestar has been calculated, the court may, in its discretion, increase or decrease that figure by the application of a multiplier to account for certain factors. In particular, the court may consider the attorneys' risk of litigation, the contingent nature of their expected compensation, the quality of representation, and the results achieved. *Prudential Securities,* 912 F.Supp. at 102. In making that determination, however, the court must be mindful of its role as a fiduciary charged with the task of guarding the rights of the class members. *City of Detroit v. Grinnell Corp.,* 560 F.2d 1093, 1099 (2d Cir.1977) (*"Grinnell II"*); *Wallace,* 7 F.Supp.2d at 135; *In re Prudential Securities Inc. Ltd. Partnerships Litigation,* 985 F.Supp. 410, 414 (S.D.N.Y.1997).

In the case at bar, plaintiffs' counsel have submitted affidavits of attorneys from twelve different firms, all of which were involved in representing plaintiffs in this case. Each of those affidavits is accompanied by a chart setting forth the number of hours spent on this case by each attorney and paralegal, together with a claimed hourly rate. The claimed rates vary widely; the rates for attorneys run from a low of $180 per hour to a very high rate of $525 per hour. The rates for paralegals run from $70 to $145 per hour.

■ I realize that many of the attorneys involved in this case practice in New York City and other large cities, where prevailing rates are relatively higher than in other parts of the Circuit. The Second Circuit, however, has stated that "[i]t is well-established that the 'prevailing community' the district court should consider to determine the 'lodestar' figure is 'the district in which the court sits.'" *Luciano,* 109 F.3d at 115–16 (district court properly based fee award on rates in Eastern District of New York, where action was commenced and litigated, rather than higher rates prevailing in Southern District, where plaintiff's attorney practiced) (quoting *Polk v. New York State Dep't of Correctional Services,* 722 F.2d 23, 25 (2d Cir.1983)). *See, e.g., In re Fine Paper Antitrust Litigation,* 751 F.2d 562, 591 (3d Cir. 1984) (settlement of class action); *Blissett v. Casey,* 969 F.Supp. 118, 131 (N.D.N.Y.1997) (applying rate prevailing in Northern District of New York in awarding fee to attorney whose office was in Southern District), *aff'd,* 147 F.3d 218 (2d Cir.1998).

An exception to this rule may be made if "there has been a showing that 'special expertise of counsel from a ... [different] district [was] required.'" *Cruz v. Local Union No. 3 of Int'l Bhd. of Elec. Workers,* 34 F.3d 1148, 1159 (2d Cir.1994) (quoting *Polk,* 722 F.2d at 25). Although plaintiffs' counsel have not expressly made a showing that it was necessary for plaintiffs to retain out-of-town counsel in this case, I recognize that the number of attorneys in the Rochester area who practice extensively in securities fraud law is limited, so I will make some allowance for that fact.

■ Nonetheless, I still find some of the claimed rates to be extraordinarily high. Although counsel contend that the requested rates are competitive in their respective communities for cases of this type, the court's own research indicates otherwise. In *Wallace,* for example, the court reduced the attorneys' rates from a high of $550 per hour to high of $300 per hour. 7 F.Supp.2d 132 at appendix. That particular reduction, in fact, was applied to a request by an attorney with Berger & Montague, a Philadelphia firm that is also involved in the case at bar. In the

---

The only support for using such a method in this circuit, however, appears to be a single line of dictum contained in a footnote in *Blum v. Stenson,* 465 U.S. 886, 900 n. 16, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), which was not a common-fund case, but instead involved a fee-shifting statute. Until the Second Circuit expressly departs from the rule established in *Grinnell I,* this court is bound to use the lodestar method. *Wallace,* 7 F.Supp.2d at 138.

instant case, Berger & Montague requests an hourly rate of $460 for one of its partners.

In *Lyons*, the plaintiffs were represented by Abbey & Ellis, which is now known as Abbey, Gardy & Squitieri, LLP ("AG & S"), the firm that has performed the largest share of the work in the instant case. *See* Compendium of Exhibits in Support of Final Approval of the Proposed Class Action Settlement Ex. A. Using the exact language that they have used in their memorandum of law in this case, the plaintiffs' counsel in *Lyons* asserted that their claimed rates of $495, $395, $375 and $210 per hour were "competitive market hourly rates in their respective legal communities for cases involving complex class action securities litigation." *Lyons*, 987 F.Supp. at 279; Plaintiffs' Memorandum of Law at 54.[2] That court, however, stating that counsel had "provide[d] no evidentiary support for this contention," applied a rate of $225 per hour, which was listed in the New York State Bar Association 1997 Desktop Reference on the Economics of Law Practice in New York as the median hourly rate for all attorneys in New York City. 987 F.Supp. at 279.

In *In re Metropolitan Life Derivative Litigation*, 935 F.Supp. 286 (S.D.N.Y.1996), the plaintiffs' attorneys sought fees at rates of up to $550 per hour; the average rate for one group of six attorneys was $455 per hour. Stating that "[i]n the real world, I cannot imagine any client tolerating the assignment of six partners at an average rate of $455 per hour to one matter," *id.* at 297, the court reduced the total amount of fees from the roughly $2.75 million requested to about $1.97 million. *Id.* at 295, 299. The firm that had sought a $550 rate, which submitted a lodestar of $244,477.50, was awarded $110,000. *Id.* at 298.

One of the firms involved in *Metropolitan Life* was Goodkind Labaton Rudoff & Sucharow LLP ("GLR & S"), which is also one of plaintiffs' counsel in the case at bar. In *Metropolitan Life*, GLR & S asked for rates ranging from $110 to $450 per hour, for a lodestar of nearly $70,000. *Id.* at 298. Stating that, among other problems, he "f[ou]nd

that the rates are high," the district judge awarded GLR & S $24,000 in fees. *Id.* at 299. In the case at bar, GLR & S's requested rates for attorneys range from $180 to $475 per hour.

The court in *Berlinsky* did state that rates of $495, $295, and $250 per hour—which were requested by Stull, Stull & Brody, a law firm that was also involved in the case at bar—"d[id] indeed correspond to the 'rate normally charged for similar work by attorneys of like skill in the area ...'" 970 F.Supp. at 351. The court did not state a basis for that conclusion, however, and as the preceding cases indicate, awards of such rates are at the very least not routine, even in the Southern District.

I also note that some of the attorneys with the highest requested rates also account for some of the largest portions of the total lodestar. For example, Arthur N. Abbey, whose requested rate is $525 per hour, spent 698.5 hours on the case, for a lodestar of $366,712.50. Lee Squiteiri spent 1255.5 hours at a requested rate of $425 per hour, for a lodestar of $533,587.50. Some of the other attorneys with high rates also have relatively high lodestars: S.R. Savett ($460 per hour, $52,900 lodestar); Stanley D. Bernstein ($475 per hour, $67,450 lodestar); Jules Brody ($495 per hour, $36,382.50 lodestar); Daniel W. Krasner ($495 per hour, $59,251.50 lodestar); David A.P. Brower ($445 per hour, $70,710.50 lodestar).

■ Equally troubling is the sheer number of attorneys involved in this case. Based on the records submitted by plaintiffs' counsel, it appears that sixty-six attorneys and at least twenty-one paralegals have worked on this case. While I recognize that the nature of this class action necessitated the use of multiple attorneys, sixty-six is still a very high number of lawyers for a single case that never even reached the summary judgment stage, much less an actual trial.

That conclusion is also borne out by the total number of hours for which compensation is sought: 7469.9. Again, I realize that a securities fraud class action will likely take

---

2. Though it may be coincidence, I note that not only is the language identical, but that statement

appears on page 54 of plaintiffs' brief both in this case and in *Lyons*.

significant time to litigate, but that is nevertheless a very high number of hours to have devoted to this case. To put that number in perspective, a single person working eight full hours a day would take nearly 934 days to work 7469.9 hours. That in turn represents roughly 187 five-day workweeks, or over three and a half years of work. I do not believe that all of those hours of work were reasonably incurred. In addition, considering the large number of attorneys among whom that work was divided, I believe that there must have been some duplication of effort here.

The total lodestar sought by plaintiffs' counsel is $2,599,970. Based on the number of hours counsel spent on the case, that represents an *average* rate of over $348 per hour. If the paralegals were not included in that calculation, the average would be even higher. As the previously-cited cases from the Southern District indicate, even that rate is high.

I am convinced, then, that both the requested rates and the hours spent on this case by the numerous lawyers involved are excessive and not reasonable and, therefore, must be reduced. Because of the nature of this case, there are some inherent difficulties in reducing the fee request by traditional means. Pending before the court is a single joint request for a single fee award constituting thirty percent of the gross settlement amount. Because the court believes that the lodestar analysis is proper, I have looked to the rates and hours submitted by the participating law firms. This exacerbates the problem because there are twelve law firms involved, many of whom assigned five or six lawyers to the case at varying rates. The Second Circuit and other courts have recognized that in circumstances similar to this, reductions by a percentage of the fee request are a proper and efficient means of dealing with multiple petitions at varying rates. *In re Agent Orange Product Liability Litigation*, 818 F.2d 226, 237 (2d Cir.1987) ("in cases in which substantial numbers of voluminous fee petitions are filed, the district court has the authority to make across-the-board percentage cuts ..."); *New York State Ass'n for Retarded Children v. Carey*,

711 F.2d 1136, 1146 (2d Cir.1983) (in "cases with voluminous fee applications, courts have recognized that it is unrealistic to expect a trial judge to evaluate and rule on every entry in an application," and therefore "[t]hese courts have endorsed percentage cuts as a practical means of trimming fat from a fee application"); *Metropolitan Life*, 935 F.Supp. at 298 n. 16 (reducing lodestars of two firms by 25% and 15% to account for high rates, and then reducing the revised lodestar by 40% to account for inefficiencies and duplication of effort).

Such an approach is appropriate and necessary here. This is especially true because there is a joint request for a single fee award and no one has requested that the court apportion the award among the participating law firms. In fact, I understand that the attorneys are anticipating a single fee award from the court which will be divided among the participating attorneys according to their respective roles in litigating the case and negotiating the settlement. *See In re Agent Orange Product Liability Litigation*, 818 F.2d 216, 223 (2d Cir.), *cert. denied*, 484 U.S. 926, 108 S.Ct. 289, 98 L.Ed.2d 249 (1987) (court may award lump-sum fee to counsel and permit them to divide it among themselves under terms of private fee-sharing agreement based on relative value of individual attorneys' services).

Therefore, recognizing these difficulties but believing that some reduction and modification is appropriate, I hereby reduce the total lodestar submitted by counsel by fifteen percent. With this reduction, the net lodestar figure is $2,209,974.50.

The next question is whether to apply a multiplier to the lodestar. As the court noted in *Berlinsky*, "the use of multipliers has become increasingly disfavored. The Second Circuit has made clear that in the event that the lodestar figure is sufficient to compensate counsel, a multiplier need not be used." 970 F.Supp. at 351 (citing *Grinnell II*, 560 F.2d at 1099). Indeed, "a number of courts in this Circuit have refused to enhance the attorney's fee with any multiplier." *Id. See also Metropolitan Life*, 935 F.Supp. at 295 ("In recent years, the propriety of enhancements of lodestars has been questioned").

■ Nonetheless, for the reasons that follow, I believe that some enhancement of the lodestar amount is appropriate in this case. At the outset, however, I note that the total award sought by counsel is 5.7 times the lodestar. That is far greater than the norm for these types of cases in this circuit. *See, e.g., Wallace,* 7 F.Supp.2d at 141 (1.5 times); *Painewebber,* 999 F.Supp. at 725 (1.4); *Lyons,* 987 F.Supp. at 280 (1.92); *Berlinsky,* 970 F.Supp. at 351 (1.4; ·noting that "[t]he majority of those courts in which multipliers have been used have not employed a multiplier of 2.97," the multiplier requested by plaintiffs' counsel); *Prudential Securities,* 985 F.Supp. at 417 (1.25); *Prudential Securities,* 912 F.Supp. at 102, 104 (1.46); *In re McDonnell Douglas Equip. Leasing Securities Litigation,* 842 F.Supp. 733, 746 (S.D.N.Y.1994) (1.44). Since "[i]t is the Court's duty to avoid any sense of vicarious generosity or to permit the lodestar to be enhanced above a fair and reasonable amount," *Prudential Securities,* 985 F.Supp. at 417, I decline to apply such a large multiplier to the lodestar.

■ One of the most important factors in calculating an upward adjustment is counsel's risk of litigation, i.e., "the fact that, despite the most vigorous and competent of efforts, success is never guaranteed." *Grinnell I,* 495 F.2d at 471; *Weseley v. Spear, Leeds & Kellogg,* 711 F.Supp. 713, 716 (E.D.N.Y. 1989). Because of the court's fiduciary role, however, "[m]ultipliers based on risk should be awarded modestly, with a vigilant eye to the interests of the class at hand." *Wallace,* ·7 F.Supp.2d at 141. In addition, "[e]ven when making allowance for such subjective factors as the 'risk of litigation,' the courts must be mindful that an attorney will receive an otherwise reasonable compensation for his time from the lodestar figure alone." *Grinnell II,* 560 F.2d at 1099.

With respect to the application of· a multiplier based on risk, it should be noted that the courts are divided over whether the Supreme Court's decisions in *Blum v. Stenson, supra, City of Burlington v. Dague,* 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992), *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987), and *Penn-sylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986), which collectively prohibit multipliers for risk and certain other factors in cases brought under fee-shifting statutes, are controlling in common-fund cases. *Compare In re General Motors Corp. Pick–Up Truck Fuel Tank Products Liability Litigation,* 55 F.3d 768, 822 (3d Cir.) (district court erred in applying multiplier for contingent nature of success in class action products liability case, given Supreme Court's rejection of such multipliers in *Dague* ), *cert. denied,* 516 U.S. 824, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995); *Nensel v. Peoples Heritage Fin. Group, Inc.,* 815 F.Supp. 26, 28 (D.Me.1993) (concluding that *Dague* applies equally to common-fund and fee-shifting cases) *with Florin v. Nationsbank of Georgia, N.A.,* 34 F.3d 560, 565 (7th Cir.1994) ("risk multipliers remain available in common fund cases after *Dague* "); *In re Washington Pub. Power Supply Sys. Securities Litigation,* 19 F.3d 1291, 1301 (9th Cir.1994) ("district courts have discretion to use risk multipliers to enhance the lodestar in common fund cases").

Although the Second Circuit has not addressed this issue, two district judges from within this circuit have. In *McDonnell Douglas,* 842 F.Supp. at 741, the court concluded that *Dague's* prohibition of post-lodestar adjustments for risk does not apply in common-fund cases, but that "*all* other factors bearing on the ultimate fee award, including the quality of the representation, the complexity of the litigation, the delay in receipt of payment, and the skillfulness of opposing counsel, are properly includable in the computation of the lodestar amount." However, in *In re Bolar Pharm. Co., Inc. Securities Litigation,* 800 F.Supp. 1091, 1095–97 (E.D.N.Y.1992), the court concluded that the above-mentioned Supreme Court decisions apply to common-fund cases, and hence ban fee enhancements for contingency or risk.

I agree with the Seventh and Ninth Circuit's reasoning in *Florin* and *Washington Pub. Power Supply* that because of the differences between these two types of cases, these Supreme Court decisions are not controlling in common-fund cases. Neverthe-

less, to a great extent the *logic* of those decisions is applicable here. While a risk-based multiplier is not barred here, the Supreme Court's concerns about the problems with such enhancements (such as their tendency to "double count" factors already subsumed in the lodestar, or "to provide attorneys with the same incentive to bring relatively meritless cases as relatively meritorious ones," *Dague,* 505 U.S. at 562–63, 112 S.Ct. 2638) should serve as a caution against too freely or too generously applying upward adjustments for risk in a common-fund case.

■ One factor affecting the attorney's risk is whether a relevant government action was instituted against the defendant. *Grinnell I,* 495 F.2d at 471; *PaineWebber,* 999 F.Supp. at 724; *Prudential,* 985 F.Supp. at 414. The original complaint in this action was filed on June 6, 1994. On January 25, 1995, B & L publicly announced that the Securities Exchange Commission ("SEC") was investigating its accounting practices concerning an inventory imbalance among B & L's distributors. In September 1995, plaintiffs filed a second amended complaint incorporating a second alleged class period. That class period had first been pleaded in a separate action, *Grossman v. Bausch & Lomb,* 95–CV–6052L, which had been commenced on January 31, 1995. The second amended complaint also referenced the SEC investigation. *See* Second Amended Complaint ¶ 117. A third amended complaint, which sought to expand one of the class periods, was filed on November 21, 1995, and likewise referred to the SEC investigation. *See* Third Amended Complaint ¶ 130.

The SEC announced the results of its investigation on November 19, 1997. The SEC found that B & L and three B & L officers (none of whom are defendants in the instant action) had violated certain federal securities statutes. Based on B & L's and those individuals' offers of settlement, the SEC ordered them to cease and desist from committing such violations, but it imposed no other penalties. It was at this time that the parties agreed in principle to settle this class action as well.

Plaintiffs' counsel point out that the original complaint in this action predated the announcement of the SEC investigation, and they contend that this action relates to a greater period of activities on B & L's part than the SEC investigation. Nevertheless, the factual scope of this case and of the SEC investigation clearly overlapped each other to a great extent. In addition, even if, as counsel state, it was not until October 1997 that they were able to examine some records in the SEC's possession, and that they were never allowed to view any internal SEC documents, the existence of the SEC investigation would certainly have put additional pressure on B & L to settle the case, and would also have given plaintiffs' counsel greater reason to believe that they could prevail. *See PaineWebber,* 999 F.Supp. at 725 (while class counsel did not necessarily piggyback on SEC's investigation of defendant, their risk in litigating was substantially reduced by SEC's investigation and subsequent order *finding violations by defendant*).

Also adding to what defendants likely perceived as a serious risk of liability were two articles about B & L in *Business Week* magazine on December 19, 1994 and October 23, 1995. The first story, "Numbers Game at Bausch & Lomb?," detailed B & L's "dubious methods to inflate yearend sales" figures by forcing distributors to order more inventory than they needed. Defendants' Motion to Dismiss (Item 41) Ex. C–1. The second article, a cover story entitled "Blind Ambition," was an extensive examination of how B & L's intense drive to boost profits had led "some managers [to] play[ ] fast and loose with accounting principles and ethics." *Id.* Ex. C–2. Lee Squiteiri, whose firm is head of a committee of plaintiffs' counsel, states that he spoke with the author of those articles on more than one occasion during 1995. Supplemental Aff. of Lee Squiteiri (Item 95) ¶ 12.

As with the SEC investigation, it may be that plaintiffs' counsel did not directly use in this case any information contained in the *Business Week* articles. Nevertheless, their publication certainly must have bolstered counsel's confidence in their chances of success, and strengthened their hand by equally

diminishing B & L's own prospects in this litigation.

Also affecting the level of risk of litigation is the degree of novelty and complexity of the issues in the case. *Grinnell I*, 495 F.2d at 471. As stated, to the extent that securities fraud class actions are inherently complex as compared with some other types of lawsuits, this arguably would support an enhancement of the fee award. As these types of cases go, however, this one was not particularly complicated either factually or legally. The alleged scheme by B & L was fairly straightforward, and although it would undoubtedly have taken considerable time to piece together the evidence necessary to prove the alleged scheme, this case did not present any especially novel or difficult issues. *See Wallace*, 7 F.Supp.2d at 141 (declining to make upward adjustment for factual complexity in shareholder derivative action).

Although plaintiffs' attorneys contend that the case involved novel issues of secondary and derivative liability of corporate officers because of recently-decided Supreme Court and Second Circuit decisions in this area, I am not convinced that this issue was especially novel or complex. Like many other areas of the law, securities fraud law is continually evolving, and the mere fact that a higher court has recently spoken on some relevant legal issue does not mean that a case presents "novel" issues of law within the meaning of *Grinnell I*. Any multiplier based on complexity in this case should therefore be a modest one.

Moreover, the complexity of the case is mostly relevant only insofar as it affects counsel's degree of risk of litigation. The Supreme Court has held that because the novelty and complexity of a case is presumably reflected in the number of billable hours expended, "[n]either complexity nor novelty of the issues . . . is an appropriate factor in determining whether to increase the basic fee award" when the lodestar method is used. *Blum*, 465 U.S. at 898–99, 104 S.Ct. 1541; *see also Luciano*, 109 F.3d at 116 (district judge took complexity of case into account in setting counsel's hourly rate, and therefore did not abuse discretion in not making further

upward adjustment on that basis). Although *Blum*, which involved a fee-shifting statute, is not controlling here, that logic is sound.

Likewise, "[t]he 'quality of representation' . . . generally is reflected in the reasonable hourly rate." *Blum*, 465 U.S. at 899, 104 S.Ct. 1541; *Luciano*, 109 F.3d at 116 (attorney's superior skill was subsumed within lodestar calculation); *Wallace*, 7 F.Supp.2d at 141 (same). Therefore, the quality of the work performed and the standing of plaintiffs' counsel are also not sufficient bases upon which to enhance a fee award except in the "rare case" in which "the quality of service rendered was superior to that one reasonably should expect in light of the hourly rates charged and [where] the success was 'exceptional.'" *Blum*, 465 U.S. at 899, 104 S.Ct. 1541. Considering the hourly rates in this case, I find that though the level of quality of counsel's work has been high, this is not a "rare case" where an upward adjustment is warranted for that reason.

Although courts have taken the amount of the recovery into consideration in deciding whether to apply a multiplier, *see, e.g., PaineWebber*, 999 F.Supp. at 725, the Second Circuit has cautioned that "judges determining fee awards should not be unduly influenced by the monetary size of the class settlement or judgment; a large settlement can as much reflect the number of potential class members or the scope of a defendant's past acts as it can indicate the prestige, skill, and vigor of the class's counsel." *Grinnell II*, 560 F.2d at 1099.

The amount of the fund here, $42 million, is certainly substantial, but not extraordinarily large given defendants' possible exposure in this case. Plaintiffs' counsel state that they considered their maximum possible loss to be around $250 million, and that they believed their most likely damage award in the event of a trial was in the $120–$140 million range. While I believe that the size of the recovery does weigh in favor of an upward adjustment, then, again I do not think that a large multiplier is called for.

Taking all these factors into consideration, I find that a multiplier of 2 is appropriate in this case. Applying that to counsels' lodestar

of $2,209,974.50 yields a total award of $4,419,949. That represents about 10.5% of the common fund. As a percentage of the fund, that may be toward the low end of the scale among cases within this circuit; *see Weseley,* 711 F.Supp. at 718–19 ("In this circuit, fees typically range from 15% to 30% of the recovery"; collecting cases); *but see Lyons,* 987 F.Supp. at 280 (fee award represented 10.4% of settlement fund, and 1.92 times lodestar amount). As is evident from the previous recitation of multipliers applied in similar cases in this circuit, though, the multiplier itself is higher than most. *See Weseley,* 711 F.Supp. at 718–19 (citing cases applying multipliers ranging from 1.01% to 1.8%). Moreover, "[i]t is inappropriate to rely on the percentage method, and then merely run the multiplier and hourly rate numbers backwards under the facade of lodestar-multiplier analysis in order to rubber-stamp a percentage determination." *Wallace,* 7 F.Supp.2d at 139. As stated, the percentage of the fund that an award represents is merely some indication of the reasonableness of the award, which is ultimately determined by reference to the lodestar and its multiplier. *See Weseley,* 711 F.Supp. at 718 ("comparison of the size of [counsel's] fees with the total recovery serves merely as a benchmark to ensure that he is not obtaining too much of the recovery. If the fee appropriately takes into account the [relevant] factors [under the lodestar analysis], the court should not augment it solely because it represents a below-average percentage of the settlement").

### B. Costs

The only remaining issue is counsel's application for an award of costs in the amount of $608,263.49. Most of that is attributable to experts' and consultants' fees, which total $357,025.65. That figure in turn includes: $109,980 in fees charged by Melvin E. Gavron, a forensic accountant, for 327 hours of work at rates ranging from $285 to $350 per hour; $33,000 in fees charged by Dr. Paul Grier, an economist, for 110 hours of work at a rate of $300 per hour; $125,160 in fees charged by Princeton Venture Research, a now-defunct firm of forensic economists and investment valuation experts, for

545.5 hours of work at rates ranging from $90 to $390 per hour; and $83,848.59 in fees charged by The InterCapital Group, a firm of forensic economists, for 222 hours of work at fees ranging from $350 to $400 per hour.

Although the expert fees are by far the largest single component of plaintiffs' request, there are several other large items. Counsel seek a total of $95,477.40 for duplicating and copying charges, as well as $20,135.28 for "word processing" charges. In addition, counsel's combined charges for Westlaw, Lexis and other computer-based research total $39,780.65.

"Attorneys are clearly not entitled to reimbursement of expenses where the request is for an amount which is excessive or otherwise noncompensable." *In re Fleet/Norstar Securities Litigation,* 974 F.Supp. 155, 158 (D.R.I.1997) (reducing expenses by 75% of amount requested); *see also Agent Orange,* 818 F.2d at 238 ("Counsel are entitled to reimbursement only for those expenses incurred in the course of work that benefited the class. Overstaffing and other extravagances are not recoverable"; citation omitted). Therefore, "[i]t is incumbent upon counsel to persuade the court that the attorneys' fees and costs requested are reasonable and equitable." *Sosenke v. Norwood,* Civ.A. No. 91–2623, 1993 WL 512824 *5 (E.D.Pa. Dec. 6, 1993). Where attorneys requesting costs have not demonstrated that costs were reasonably incurred, courts have routinely disallowed some or all of the request. *See, e.g., United States v. Merritt Meridian Constr. Corp.,* 95 F.3d 153, 173 (2d Cir.1996) (district court did not abuse discretion in awarding $5000 in photocopying costs rather than $17,690.78 that was requested, since $5000 represented the district court's estimate of the cost of photocopying papers submitted in connection with trial, nor did court abuse discretion in denying in full request for Westlaw costs, since "computer research is merely a substitute for an attorney's time . . ."); *Democratic Cent. Comm. of District of Columbia v. Washington Metro. Transit Comm'n,* 12 F.3d 269, 272 (D.C.Cir.1994) (awarding, *inter alia,* 60% of amounts billed for photocopying and telefaxing on grounds of excessiveness); *Ackerley Communications*

*of Massachusetts, Inc. v. City of Somerville,* 901 F.2d 170, 173 (1st Cir.1990) (disallowing claims for what court deemed excessive photocopying, travel and computer research costs); *Feinberg v. Hibernia Corp.,* 966 F.Supp. 442, 453–54 (E.D.La.1997) (reducing copying costs by 50%); *Davitt v. Information Resources, Inc.,* No. 94 C 2432, 1995 WL 234630, at *5 (N.D.Ill. Apr. 19, 1995) (disallowing in full request for costs in light of court's "generous" award of attorney's fees, but noting that even if costs were awarded, it was "unknown whether the approximately $186,000 charged for experts and consultants was fully appropriate, that photocopying costs would have to be reduced, and that travel, communication, and several other expenses were part of overhead that were already included in attorney's fee award"); *Spicer v. Chicago Bd. Options Exchange, Inc.,* 844 F.Supp. 1226, 1256–66 (N.D.Ill.1993) (disallowing or reducing requested costs as inadequately documented, unnecessary, excessive, or attributable to firm's overhead); *Weinberger v. Great Northern Nekoosa Corp.,* 801 F.Supp. 804, 827–29 (D.Me.1992) (disallowing all computerized research expenses, since that is properly an item attributed to firm overhead, and reducing by 80% expenses related to photocopying, facsimile transmissions, postal and other delivery services, and telephone expenses; total expense award reduced from $48,722.88 to $12,482.81), *aff'd,* 47 F.3d 463 (1st Cir.1995); *Mokover v. Neco Enterprises, Inc.,* 785 F.Supp. 1083, 1094 (D.R.I.1992) (allowing 50% of claimed expenses for photocopying, document production, travel, Federal Express, and facsimile transfer); *In re WICAT Securities Litigation,* 671 F.Supp. 726, 742 (D.Utah 1987) (reducing by 10% expense of experts based upon counsel's failure to demonstrate value and reasonableness of that expense, and eliminating completely costs for computer research, overtime, messengers, courier, and word processing, since those expenses were already incorporated within attorneys' hourly rates).[3]

After reviewing counsel's request for costs, I find that some of the items are excessive or

3. As in the case at bar, most of the costs requested in *WICAT Securities* were sought by Abbey &

noncompensable. In response to a request by the court, plaintiff's counsel submitted additional documentation concerning the experts' and consultants' fees. I find that counsel has not adequately demonstrated that it was reasonable or necessary to incur over $350,000 in such fees in a case that never even came close to going to trial. In addition, the costs attributed to photocopying are very high, and counsel has not shown that these were reasonably incurred, either. The request for "word processing" costs is not only completely vague as to the nature or reason for those costs, but such costs are presumed to be included in counsel's overhead expenses, and are thus properly included in the award of attorney's fees.

For these reasons, I have decided to make the following reductions in counsel's application for costs: expert fees will be reduced by thirty percent; duplicating costs by forty percent; and word processing and computer-based research costs by fifty percent each. The other requested costs will be awarded in full. Expert fees, then, are reduced from $357,025.65 to $249,917.96; duplicating costs from $95,477.40 to $57,286.44; word processing costs from $20,135.28; and computer-based research costs from $39,780.65 to $19,890.33. This results in a total reduction of the award for costs from $608,263.49 to $433,006.87.

## CONCLUSION

Therefore, upon due consideration, and based on this Decision and Order, it is hereby ORDERED that:

1. Plaintiffs' motion to approve the Stipulation and Agreement of Compromise and Settlement ("Settlement"), dated April 14, 1998, is GRANTED in its entirety except for the amount plaintiffs have requested for attorneys' fees and costs;

2. Plaintiffs' request for attorneys' fees and costs is granted in part. Plaintiffs' counsel is awarded $4,419,949 in fees and total costs in the amount of $433,006.87 as full compensation; and

Ellis.

3. The Court will hereinafter enter a Final Judgment confirming and finalizing its approval of the Settlement consistent with all of the proceedings in this case and this Decision and Order.

IT IS SO ORDERED.